The **MOTOR VEHICLE MANUFACTURERS ASSOCIATION OF the UNITED STATES, INC.,** and **The Association of International Automobile Manufacturers, Inc., Plaintiffs,**

v.

**NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION, et al., Defendants,**

**American Petroleum Institute Environmental Defense Fund,** and **New York State Electric & Gas, Intervenor–Defendants.**

No. 92–CV–869.

United States District Court, N.D. New York.

Oct. 24, 1994.

Kirkland, Ellis Law Firm, Washington, DC, for plaintiff American Auto. Mfgs.; Daniel F. Attridge, Gary E. Marchant, Stuart C. Drake, of counsel.

G. Oliver Koppell, Atty. Gen. of State of N.Y. State Dept. of Law Albany, NY, for defendants N.Y. State Dept. of Environmental Conservation; Joan Leary Matthews, Asst. Atty. Gen., Helene G. Goldberger, of counsel.

Morgan, Lewis Law Firm, Washington, DC, for defendants-intervenors American Petroleum Institute; William H. Lewis, Jr., of counsel.

Environmental Defense Fund, New York City, for defendants-intervenors; James T.B. Tripp, of counsel.

Huber, Lawrence Law Firm, New York City, for defendants-intervenors N.Y. State Elec. and Gas; Mathy V. Stanislaus, of counsel.

## MEMORANDUM DECISION & ORDER

McAVOY, Chief Judge.

This decision and order addresses the only remaining count in this action by plaintiffs Motor Vehicle Manufacturers Association of the United States and The Association of International Automobile Manufacturers, Inc., against defendant New York State Department of Environmental Conservation (hereinafter DEC) and its Commissioner.

### I. Background.[1]

Under the Clean Air Act, 42 U.S.C. §§ 7401–7671q (1988 & Supp. III 1991) ("the

---

1. What follows is a brief summary of this complex statutory scheme. For a detailed descrip-

Act") the federal government sets motor vehicle emission standards that preempt state emission standards. Section 209(b)(1) of the Act, 42 U.S.C. § 7543(b)(1), however, exempts California from federal preemption of its auto emissions standards. Furthermore, § 177 of the Act, 42 USC § 7507, provides that other states may "piggyback" on California's exemption by adopting identically California's emissions standards, provided California's regulations have been adopted by California at least two years prior to the model year in which the adopting state seeks to impose the regulations, and further provided that California has been granted an EPA waiver regarding the standards in question. Finally, a piggybacking state may by its adoption neither limit the sale of California-certified vehicles nor "take any action of any kind to create, or have the effect of creating, a motor vehicle or motor vehicle engine different than a motor vehicle or engine certified in California under California standards (a 'third vehicle') or otherwise create such a 'third vehicle.'" § 177. An adopting state acts impermissibly then, if its actions cause a vehicle certified under approved California air quality standards to somehow fail to meet those requirements when imposed by a piggybacking state's adoption of California Standards.

On May 28, 1992, New York State adopted California's low-emission vehicles plan, 6 NYCRR Part 218 (1992), (hereinafter LEV plan) without adopting California's program of clean fuels requirements (hereinafter CF program).[2] Plaintiffs filed suit in this Court on July 9, 1992, seeking permanent injunctive relief from New York's standards and claiming in six counts that New York's adoption violated various provisions of the Act. Five of those six counts have been decided by this court's previous memorandum-decisions and orders in *Motor Vehicle Mfrs. Ass'n v. New York State Dep't of Envtl. Conservation*, 810 F.Supp. 1331 (N.D.N.Y.1993) and 831 F.Supp. 57 (N.D.N.Y.1993), with such modification of those memorandum-decisions and orders as worked by Judge Cardamone's decision for the Second Circuit Court of Appeals in *Motor Vehicle Mfrs. Ass'n v. New York State Dep't of Envtl. Conservation*, 17 F.3d 521 (2d Cir.1994) (hereinafter *MVMA* ).

The combined results of these decisions are as follows: on count one of plaintiff's complaint it was held that New York's failure to adopt California's CF program when it adopted California's LEV plan did not violate the identicality requirements of § 177; on count 3 of plaintiff's complaint it was held that New York's adoption of California's LEV requirements six months prior to the EPA's grant to California of the required § 209(b) waiver was not improper; on count four of plaintiff's complaint it was held that the statutory term "model year" was best read as applying on an industry-wide basis and that industry-wide, the 1995 model-year had commenced prior to May 28, 1994;[3] on count five of plaintiff's complaint it was held that New York's adoption of the zero-emission vehicles ("ZEV") sales quota portion of California's LEV plan did not impermissibly operate to "limit, directly or indirectly, the manufacture or sale of a new motor vehicle ... that is certified in California as meeting California standards," § 177; on count six it was held that the ZEV sales quotas likewise did not violate the Act's prohibition of a State's adoption of California standards in a manner that would require manufacture of a third vehicle.

tion of the Clean Air Act of 1967 and its relevant amendments, see this court's prior opinions in *Motor Vehicle Manufacturers Ass'n v. New York State Dep't of Envtl. Conservation,* 810 F.Supp. 1331 (N.D.N.Y.1993) and 831 F.Supp. 57 (N.D.N.Y.1993), and, in particular *see* Judge Cardamone's lucid and comprehensive exposition in *Motor Vehicle Manufacturer's Ass'n v. New York State Dep't of Envtl. Conservation,* 17 F.3d 521 (2d Cir.1994).

2. California enjoys a wholly separate exemption from the Act's federal preemption of motor vehi-

cle fuel requirements. *See* Act § 211(c)(4)(C), 42 U.S.C. § 7545(c)(4)(A) and § 211(c)(4)(B), 42 U.S.C. § 7545(c)(4)(B). As a result there are two different motor vehicle fuels: "California fuels," which meet California's standards, and "federal fuels" which meet federal standards.

3. The Second Circuit directed this court to enjoin New York's enforcement of the LEV plan for model year 1995 as against all manufacturers. This court entered that order on May 24, 1994.

The remaining second count of plaintiff's complaint alleges that New York's failure to adopt California's CF program when it adopted California's LEV plan will require plaintiffs to redesign their California vehicle's exhaust emission systems because of New York's higher-sulfur gasoline. Plaintiffs contend that this redesigned vehicle would constitute a third vehicle, impermissibly required by New York's failure to adopt California's CF plan. This court initially granted summary judgment for plaintiff on count two but, upon reconsideration, the court found that the nature and degree of the effect of New York gasoline's higher levels of sulfur would be controlling. This court found material and disputed questions of fact as to the nature and degree of these possible effects and ruled that plaintiffs' second count would therefore proceed to trial.

On July 15, 1994, defendants moved for reconsideration of that conclusion in light of the Second Circuit's intervening decision in *MVMA*. This court agreed that the intervening decision and its implications constituted grounds for reconsideration of plaintiffs' contentions and allowed the parties to reargue their positions on August 26, 1994. Having considered these arguments, as well as the parties' voluminous declarations, affidavits and memoranda of law, this court finds that there remain no disputed issues of material fact and that summary judgment must issue for the defendant DEC.

## II. Discussion.

Summary judgment is only appropriate when no genuine issues of material fact exist, and thus the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). There must be more than a "metaphysical doubt as to the material facts." *Delaware & H. & R. Co. v. Conrail Corp.*, 902 F.2d 174, 178 (2d Cir.1990) *quoting Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986), and all ambiguities must be weighed in favor of the nonmoving party. *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989). "Only when reasonable minds could not differ as to the import of the evidence is summary

judgement proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991), *cert. denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

The court finds that while the parties' contentions are highly technical and hotly disputed, summary judgment can properly issue because where there are no facts in dispute, the law compels judgment for the defendant and, to the extent that plaintiff has raised disputed questions of fact, these facts are not material to resolution of the only issue remaining before this court: whether New York, by identically and without alteration adopting California's LEV plan, has impermissibly required the creation of a third vehicle. This court today holds it has not.

Plaintiffs' arguments to the contrary can be summarized as follows:

**A.** That cars equipped with California-appropriate but sulfur sensitive catalytic converters may, when operated on high sulfur fuel, fail future New York enhanced I/M programs or in-use recall testing programs. In particular, plaintiffs' point to studies that indicate that manufacturers may need to modify their planned use of palladium-containing converters in California cars because palladium is uniquely sensitive to high-sulfur gasoline and operation of these converters on high sulfur gasoline may cause vehicles to fail emissions tests in New York. They claim they may either have to use a less sulfur-sensitive metal, or move the converter closer to the engine to reduce the sulfur poisoning effect. Plaintiffs claim that implementation of either solution will create a third vehicle.

**B.** That New York's high-sulfur fuel may cause the advanced onboard diagnostic systems ("OBD II"), required for California-Certified vehicles, to falsely illuminate, requiring more frequent replacement of the catalytic converter. The argument goes that since replacement becomes more probable, the manufacturers will switch from a welded catalytic converter design to a flanged bolted converter assembly in order to make later replacement less expensive.

The court will address each argument in turn.

## A. High–Sulfur Fuel and New York Enforcement:

■ In affirming this court's holding that New York had not violated the Act's identicality requirement, the Second Circuit carefully parsed § 177 and concluded that the adoption provision required piggybacking states to adopt only those standards for which California receives a waiver pursuant to § 209(b). Noting that California was not required to obtain an EPA waiver for the CF plan because Congress had treated the emissions and fuel initiatives separately, the Circuit Court found that despite requests from auto manufacturers, EPA approval of the California plan was not conditioned on the commercial availability of California low-sulfur fuels. That Court also observed that California adopted its LEV standards over a year before it finalized its CF gasoline rules. In short, the Circuit concluded that since the CF program was not part of California's § 209(b) EPA waiver application, New York was not only not required to adopt the CF plan, but was actually precluded from doing so under § 177.[4] *MVMA* at 532–33.

This premise led the Second Circuit to the conclusion that New York's adoption of California's LEV plan satisfied the statutory identicality requirement, even absent adoption of the CF program. *Id.* This court now finds that having adopted the California standards identically, New York's failure to adopt the CF program cannot, standing alone, be characterized as an act forcing the creation of a third-vehicle.

California currently allows manufacturers to certify vehicles using phase two-type gas (the "cleanest" of California's clean fuels) as an integral part of new motor vehicle test procedures. Furthermore, as pointed out in *MVMA,* New York's regulations provide that motor vehicles will be certified under procedures identical to those used in California, permitting manufacturers to certify using California phase one or phase two gasoline: New York's regulations do not deprive manufacturers of the ability to certify on California gasoline the vehicles they sell in New York. *See* 6 NYCRR § 218–5(b). The foregoing establishes that New York's high-sulfur fuel will have no impact at all on its implementation of the California plan as to initial certification. The record is devoid of any allegation that the effect of high sulfur fuel will cause California cars to fail certification procedures in New York.[5] New York's adoption of the LEV program identically prevents plaintiffs from making any showing that they are required by New York's adoption to create a third vehicle—as matters stand today any vehicle certified in California can properly be certified and sold in New York.

Plaintiffs argue, however, that New York's adoption of the LEV standards automatically forces New York to adopt stricter in-use recall and Inspection and Maintenance programs (I & M programs) to monitor and enforce vehicle compliance with the adopted standards over the life of the vehicle. Plaintiffs contend that because they have raised an issue of fact as to whether the more sensitive California catalytic converters[6] will

4. California's fuel preemption exemption is contained in § 211 of the Act. New York could properly adopt these provisions only under 211's waiver provision, (§ 211(c)(4)(B), 42 U.S.C. § 7545(c)(4)(B)).

5. Plaintiffs assert that they have now produced confidential sulfur testing data from Honda, Toyota and Nissan, but the declaration referencing these studies characterizes them as showing "high sulfur gasolines will substantially increase the risk of non-compliance" with *later recall testing* using the California standards. Marchant Decl. ¶ 19.

6. While not relevant to the analysis here, the magnitude and impact of this problem remains obscure. Plaintiffs offer test results that purport to show that high sulfur fuels will adversely

affect catalytic converters made with palladium. However, the strongest statement of the import of the palladium studies is plaintiffs' vague assertion (echoed in a declaration by GM Emissions Activities Department Manager Weverstad) that "GM like *some other* manufacturers, plans to use palladium-containing converters on *some vehicles* to meet the California standards because of palladium's important advantages in a low-sulfur environment." Pl.Mem.Opp.S.J. at 6. Furthermore, the primary study on which plaintiffs rely was found to be sufficiently discredited by the Massachusetts Department of Environmental Protection to preclude a likelihood of success on the merits in an application for a preliminary injunction on claims closely paralleling the claims this court addresses today. *See American Automobile Mfrs. Ass'n v. Greenbaum,* 1993 WL 443946 at 5–6 (D.Mass.1993).

have been "poisoned" by prolonged use of New York high-sulfur fuels, they face the real danger of failing in the future to meet these more stringent in-use standards and so must create a third-vehicle now. They argue that New York's refusal to issue a binding commitment not to enforce more stringent in-use standards compels a finding that New York has violated the Act.

These arguments are sufficiently answered by the fact that New York has not yet adopted either a stricter I & M program or an in-use recall program. At this time New York relies on California's in-use testing results and defendant DEC asserts that it lacks even the statutory authority to adopt an in-use recall program. While defendants acknowledge that they intend to adopt a stricter I & M program in the future (as required by the federal Clean Air Act) they indicate that such adoption will be preceded by a separate rulemaking process in which the plaintiffs will be afforded full opportunity to participate. In short, neither program yet exists and this court simply cannot review non-existent regulatory programs, the requirements of which have not yet been promulgated.

█ Plaintiffs' claims as to these requirements are not yet ripe and their doomsday predictions as to what New York State might do to fulfill its environmental obligations will not serve to ripen them. Plaintiffs rely on *Pac. Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Com.*, 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983) for the proposition that because they need to design today cars that might be subject to New York's regulations tomorrow, the questions raised are now ripe for review. This court, however, finds that the facts here more closely mirror those that underlie the part of that opinion holding the regulations challenged there unripe for judicial review. *Id.* at 201–02, 103 S.Ct. at 1720–21. Merely because New York is required to act in these areas in the future does not empower this court to predict what those actions will be and to further advise New York on the legali-

ty of those hypothetical regulations. Just as in *Pacific Gas & Electric*, because this court cannot know whether New York will pass regulations which create a third vehicle violation,[7] judicial consideration of these incipient but unenacted regulatory programs must await further developments. *Pac. Gas & Elec.*, 461 U.S. at 203, 103 S.Ct. at 1722.

New York State is entitled to a presumption that when it embarks on I & M and recall programs, it will do so fairly and in compliance with § 177. When defendants act in these areas, if plaintiffs find themselves prejudiced by a violation of the statute, plaintiffs can seek relief from the State's actions at that time. Today however, plaintiffs' question of fact as to whether New York's high-sulfur gasoline might cause vehicles to fail hypothetical future New York regulations is immaterial as to whether New York today stands in violation of § 177's third car prohibition.

### B. High–Sulfur Fuel and the OBM II Requirements:

█ Plaintiffs' second third vehicle argument likewise relies on the impact of high-sulfur fuels on catalytic converters. Defendants have adopted California's regulations which require on-board diagnostic computers ("OBD–II systems") that monitor the performance of the vehicle's emissions control system. Plaintiffs argue that the operation of California vehicles on high-sulfur fuel will eventually cause the system to falsely illuminate the malfunction indicator dash-light. The third vehicle argument is further attenuated as follows: since it will be less expensive to replace the catalytic converter than to trace whether the MIL has falsely illuminated, manufacturers will switch to a flanged mounting for New York vehicles as opposed to the welded mounting it intends to use in California. This flanged mounting system will allegedly result in easier, hence less expensive removal of the converters, although even this is disputed by defendants.

Defendants first contend that the manufacturer's alleged switch from a welded to a

---

7. For instance, the Massachusetts Department of Environmental Protection has committed to "ordering recalls only after making sure that sulfur

effects are removed." *See American Automobile Mfrs. Ass'n v. Greenbaum,* 1993 WL 443946 at 7 (D.Mass.1993).

flanged emission system would require no certification changes. They point to the unrebutted affidavit of Duc Nguyen, a Senior Engineer at the California Air Resources Board (CARB), who asserts that the means of mounting a catalytic converter is not information of which CARB takes notice in certifying emission control systems: manufacturers are not now required to inform CARB, nor do most manufacturers inform them, of alterations in catalytic converter mountings. Defendants then argue that design changes made by manufacturers that would not rise to the level of requiring a separate certification if made during manufacture of an already certified vehicle cannot be deemed to have resulted in a third vehicle. They analogize to the process by which manufacturers make "running changes" during manufacture of post-certification vehicles: unless a change is materially different in that it reasonably may be expected to affect emission controls, such changes do not require EPA certification.

Finally, defendants argue that even if New York had *expressly* required such an alteration in the converter mounting, such alteration is a de minimis modification that works no functional change on the emission control system. The problem of inaccurate dash-panel lighting identified by plaintiffs' GM study will not be addressed or prevented by the modifications, only access to the emissions system will be eased. In short, defendants' claim that a New York vehicle would not be "different than a motor vehicle or engine certified in California" within the meaning of § 177.

Plaintiffs respond that the operative word in § 177 is "different": that no action of any kind may be taken that has the effect of creating a vehicle different from a vehicle certified in California to meet California standards. They cite to Webster's dictionary to define "different" as meaning "partly or totally unlike in nature, form, or quality; . .

having at least one property not possessed by another." They offer, however, no standard to guide the court in distinguishing significant from insignificant "differences." They seem to seek an identicality standard: *any* alterations made to a California car motivated by New York conditions would, in their view, constitute a third vehicle.

Plaintiffs go on to argue that even under defendants' proposed standard (only where modification would require new certification would there be a third vehicle) the mounting alterations would require new certification and hence constitute a third vehicle. Plaintiffs speculate that the change from the welded to the flanged converter assembly would "likely" require certification under the California LEV standards. They claim that "manufacturers expect" that the new California standards will endow emission system leakage, and hence welding versus flanging, with greater significance. Echoing their "New York-will-not-guarantee-us-it-won't-therefore-we-are-entitled-to-assume-it-will" argument, plaintiffs buttress this assertion by stating that "CARB has provided no indication to the contrary." They attempt to rebut defendants' Nguyen affidavit by pointing toward the declaration of GM Emissions Activities Department Manager Weverstad, which states only that Mr Nguyen "does not claim to know whether future emissions control systems will rely on near-leak-free exhaust assemblies to meet the new CARB standards." Weverstad Decl. at ¶ 20.

This court need neither adopt the "certification-only" third vehicle standard suggested by defendants[8] nor vest the auto manufacturers with unilateral control over the permissibility of individual state's § 177 adoptions, as plaintiffs seem to suggest, to find that the changes of which plaintiffs complain are simply not required by New York's adoption of California's LEV program. Certainly New York has not expressly required that manufacturers change their emissions sys-

---

8. While defendants' standard might be overbroad, the fact that the statute speaks of third vehicles in terms of "engines or vehicles certified by California," indicates that some weight should properly be given to the fact that none of the proposed modifications would require resubmission for certification in California, *i.e.* create a different "engine category" for CARB purposes. Furthermore, plaintiffs' have insufficiently rebutted defendants' evidence that welding versus flanging is viewed as insignificant by CARB. This court finds that their responses to the Nguyen affidavit are future-looking and speculative.

tems mounting. Likewise, plaintiffs' have failed to show that New York's adoption will *de facto* inevitably cause the switch from flanged to bolted assemblies.

Plaintiffs simply cannot avoid the fact that California vehicles will be required to operate on both California fuels and high sulfur fuels. Furthermore, the manufacturers' have determined that no global changes will be required to make California cars removed from California operate on high sulfur fuels: the manufacturers have indicated that they will deal with the same problems they claim require modification in New York, on a case-by-case basis elsewhere. Likewise, the manufacturers have indicated that they will not notify purchasers of California cars that these vehicles should be operated on California fuels only. It follows then that any modifications the manufacturer's adopt will be on their own initiative—choices the Second Circuit calls marketing decisions—not requirements imposed by New York.

The court notes that only one manufacturer (GM) has seen fit to study the alleged OBD–II problems,[9] offered documentary support for tracing the phenomenon to high sulfur fuels,[10] or makes any claim to being forced to contemplate OBD–II re-design. Furthermore, as noted above, plaintiffs indicate that the manufacturers have no intention of notifying California buyers that their vehicles must only be operated in California or on California Gasoline. The arguments raised by defendants (and hotly disputed as to magnitude by plaintiffs) that some number

of California vehicles will migrate from California and that some border Californians will undoubtedly use cheaper, non-California gas in their California cars likewise compel this conclusion. Plaintiffs dismiss defendants' migrating California cars arguments by claiming that a disputed issue of fact exists as to the magnitude of the migration. But regardless of the magnitude, the simple fact remains that a class of California cars will be subject to the same alleged problems on which plaintiffs' rely to characterize New York's adoption as requiring the creation of a third vehicle, yet in this other context plaintiffs have resolved to take no action and make no design alterations.

The theoretical alterations that may be undertaken to spare the auto manufacturers future expense (if undertaken at all), which plaintiffs style as required modifications, are actually nothing more than the manufacturers selecting from an array of options open to them. That flanged mounting represents an attractive alternative and so might be utilized represents a ·choice, similar to the design decision the Second Circuit addressed in *MVMA* and which that court called "a marketing choice of [the manufacturers] and not a requirement imposed by the DEC." *MVMA* at 538. Since New York has neither expressly nor de facto *required* the manufacturers to make these alterations, New York cannot be deemed to have impermissibly acted so as to have required the creation of a third vehicle.

9. Defendants claim that this flawed study represents a single test on a catalytic converter artificially aged to 75–100,000 miles, which plaintiffs tepidly assert is merely "similar to one" that will be used on a single engine family of GMs. This same study was examined and found insufficient to show a likelihood of success on the merits in the *District Court of Massachusetts'* rejection of plaintiffs' application for a preliminary injunction against Massachusetts' adoption of the California standards. *See American Automobile Mfrs. Assoc'n v. Greenbaum*, 1993 WL 443946 at 7 (D.Mass.1993).

This court finds that whether or not this study might nevertheless raise a question of fact as to the effect of high sulfur gasoline on catalytic converters, it does not sufficiently raise a material question as to whether New York has required the auto manufacturers to redesign their emissions mountings and hence required the creation

of a third vehicle. This is particularly true where, as discussed above, the manufacturers aver that they anticipate no changes in those California vehicles that will be operated on high-sulfur fuels whether or not New York adopts California's standards. Bearing in mind that the argument here concerns only whether the flanged v. welding changes constitute third vehicles, plaintiffs' response that these other California vehicles will not be subject to New York's regulations becomes a non sequitur.

10. Plaintiffs respond with a blizzard of affidavits and research showing that sulfur reduces the emissions control efficiency of some catalytic converters, but this point is not disputed. The court here, however, focuses on the false MIL illumination and finds plaintiffs' allegations supported by only the GM study.

## C. The Effects of High–Sulfur Fuel Generally:

■ Finally, the court notes that plaintiffs have raised questions of fact that flow only from the effects of long-term use of high-sulfur fuels on catalytic converters. This court finds that, standing alone, any alterations plaintiffs make in their vehicles because of the distinction between federal and California gas are as a matter of law not alterations that can be fairly characterized as constituting a third vehicle impermissibly required by an act of New York State's. As discussed above and clarified beyond peradventure in *MVMA*, Congress has elected to treat its fuel and emissions anti-pollution initiatives separately. As to fuel, the Congress expressly exempted California from the Act's federal fuel requirements. *See* Act § 211(c)(4)(B), 42 U.S.C. § 7545(c)(4)(B). Furthermore, unlike in § 177, Congress added no third vehicle prohibition to § 211(c)(4)(B). In exempting California fuels, Congress made a judgment that the design modifications and compromises with which auto manufacturers might be forced to contend because of the distinctions between California and federal fuels, were acceptable in light of the contemplated air quality benefits from the overall legislative scheme.

What the plaintiffs here seek to do is to point to vehicles designed expressly for California's clean fuels and unilaterally designate those vehicles as "second (California) vehicles." According to plaintiffs then, any alterations required to optimize these California vehicles' performance on federal fuels, undertaken in states that have piggybacked on California's emissions standards, result in that state having created an impermissible third vehicle. But the performance variances that plaintiffs are forced to ·address flow not from a state's act in adopting California's emission standards, but from Congress' exemption of California from federal fuels standards. If plaintiffs are successful in asserting that the alterations made for high-sulfur fuels, alterations made necessary because of the manufacturers' initial design choices in response to California's fuel exemption, constitute violations of the § 177 third vehicle prohibition, plaintiffs in effect will have succeeded in engrafting the § 177 identicality requirement and third vehicle prohibition onto California's fuel exemption.

But the third vehicle prohibition, like the sales-limitation prong of § 177, "is designed to reinforce the identicality requirement" of the emission standards adoption provision. *MVMA* at 536. Once it is understood that emission standards and fuels requirements are distinct and that states are free to adopt California's LEV standards without adopting its CF program, it becomes clear that plaintiffs here seek to prosecute indirectly the claims that the Second Circuit has directly rejected—their identicality claims that seek to restrict the reach of § 177 by tethering it to the effects flowing from California's § 211(c)(4)(B) fuels exemption. New York's LEV adoption, however, is properly viewed standing alone, separate from California's fuel exemption. As stated by the Second Circuit:

> [o]ur reading of § 177 permits New York to adopt emission standards more stringent than those it would be left with under current federal law, and the LEV, standing alone, does not force auto manufacturers to do something more than they already have to do, that is, develop a plan to meet the fleet average requirement. After all, the manufacturers will presumably design and build the same cars for California as will be sold in New York.

*MVMA* at 533.

■ In short, it is insufficient to make out a § 177 violation for plaintiffs to design a vehicle only for California's clean fuels and then point to variances that flow from their California fuel-based design choices. Indeed, defendants do not deny that high-sulfur fuels may impact on catalytic converters—but standing alone this impact does not implicate the third vehicle prohibition. Once identicality has been satisfied, that prohibition bars states from *administering and enforcing* standards identical to California's in such a burdensome way as to effectively require a third vehicle. *MVMA* at 537. Even a state that meets the identicality requirements cannot adopt imprecise testing procedures, or require noncompliance remediation that would impose an undue burden on manufac-

turers. *Id.* But absent such burdens, that the manufacturers must design vehicles that operate on both California and federal fuels is not the result of New York State's adoption of the LEV plan.

When New York's adoption of the LEV standards is viewed standing alone it becomes clear that it is the manufacturers' efforts to address California's phase two low-sulfur fuels that motivates their initial design choices: simply because these choices are less efficient and *may* require modifications when used with federal gas, such as is found in most other states, it does not follow that these modifications flow from New York's lawful and identical § 177 adoption of the LEV plan. It is not New York that has required plaintiffs to reconsider their emission systems: their reconsideration follows from their initial choices based on California's clean fuels. The decision as to which gas the manufacturers initially gear their vehicles toward is clearly that type of decision the Second Circuit has called "a marketing choice of [the manufacturer's] and not a requirement imposed by the DEC." *MVMA* at 538.

**CONCLUSION:**

Because New York has not adopted a regulatory program more burdensome than California's so as to require plaintiffs to create a third vehicle, and because plaintiffs have not shown that the vehicle alterations that they allege they will undertake are required by New York's § 177 adoption of California's LEV plan, and because plaintiffs cannot show that such modifications flow from New York's adoption of California's LEV standards, summary judgment is hereby granted to defendants New York State Department of Environmental Conservation and its Commissioner. Count two, the only remaining count of Plaintiffs' complaint, is hereby dismissed.

**IT IS SO ORDERED.**