The MOTOR VEHICLE MANUFACTURERS ASSOCIATION OF the UNITED STATES, INC. and Association of International Automobile Manufacturers, Inc., Plaintiffs–Appellants,

v.

NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION and Langdon Marsh, Commissioner, Defendants–Appellees,

and

Environmental Defense Fund, Inc., American Petroleum Institute and New York State Electric & Gas Corporation, Defendants–Intervenors–Appellees.

No. 1543.
Docket 94–9114.

United States Court of Appeals, Second Circuit.

Argued May 8, 1995.

Decided Jan. 10, 1996.

---

Daniel F. Attridge, Washington, D.C. (Edward W. Warren, Stuart A.C. Drake, Gary E. Marchant, Kirkland & Ellis, Washington, D.C.; Phillip D. Brady, V. Mark Slywynsky, American Automobile Manufacturers Association, Detroit, Michigan; Charles H. Lockwood, John T. Whatley, Association of International Automobile Manufacturers, Inc., Rosslyn, Virginia, of counsel), for Plaintiffs–Appellants.

Joan Leary Matthews, Assistant Attorney General, Albany, New York (Dennis C. Vacco, Attorney General of the State of New York, Peter H. Schiff, Deputy Solicitor General, Val Washington, Assistant Attorney General, New York State Department of Law, Albany, New York, of counsel), for Defendants–Appellees; (James T.B. Tripp, New York City, for Environmental Defense Fund, Inc.; William H. Lewis, Jr., Hunter L. Prillaman, Morgan, Lewis & Bockius, Washington, D.C., G. Kimball Williams, Jeffrey L. Culkin, McNamee, Lochner, Titus & Williams, P.C., Albany, New York, G. William Frick, David T. Deal, American Petroleum Institute, Washington, D.C., for Amer-

ican Petroleum Institute; Seth A. Davis, Michael G. Psareas, Huber Lawrence & Abell, New York City, for New York State Electric & Gas Corp., all of counsel, and on the brief), for Intervenors–Defendants–Appellees.

Richard A. Kassel, New York City (Natural Resources Defense Council, New York City, of counsel), filed a brief on behalf of American Lung Association; Environmental Advocates; Natural Resources Defense Council; League of Women Voters of New York State as amici curiae.

Timothy J. Dowling, Washington, D.C. (Lois J. Schiffer, Assistant Attorney General, David C. Shilton, U.S. Department of Justice, Environment and Natural Resources Division, Washington, D.C.; Jean C. Nelson, General Counsel, Alan W. Eckert, Associate General Counsel, Michael J. Horowitz, Office of General Counsel, U.S. Environmental Protection Agency, Washington, D.C., of counsel), filed a brief on behalf of the United States as amicus curiae.

David Bookbinder, Assistant Attorney General, Boston, Massachusetts (Scott Harshbarger, Attorney General, William L. Pardee, Assistant Attorney General, Boston, Massachusetts; Richard Blumenthal, Attorney General, Brian Commerford, Assistant Attorney General, Hartford, Connecticut; Jeffrey B. Pine, Attorney General, Michael Rubin, Assistant Attorney General, Providence, Rhode Island; Jeffrey L. Amestoy, Attorney General, J. Wallace Malley, Jr., Deputy Attorney General, Montpelier, Vermont, of counsel), filed a brief on behalf of Massachusetts, Connecticut, Rhode Island, and Vermont as amici curiae.

Before NEWMAN, Chief Judge CARDAMONE, and PARKER, Circuit Judges.

CARDAMONE, Circuit Judge:

Plaintiffs associations of American and foreign automobile manufacturers appeal from the summary judgment dismissal of the only remaining count of their action against the New York State Department of Environmental Conservation (DEC) and its Commissioner, Langdon Marsh, by the United States

District Court for the Northern District of New York (McAvoy, C.J.). Plaintiffs have sought through this litigation to prevent the adoption by New York State of regulatory standards embodying California's strict auto emission requirements.

The federal Clean Air Act, 42 U.S.C. §§ 7401–7671q (1988 & Supp. III 1991) (CAA or the Act), permits states to escape federal preemption of auto emissions standards by adopting California's standards. New York has done so. But it has declined to adopt California regulations mandating the sale of clean, low-sulfur fuels that aid in the reduction of pollution from auto exhaust. It is plaintiffs' contention that the high-sulfur content of gasoline commercially available in New York will corrupt the performance of catalytic converters installed in motor vehicles that are designed to comply with California's regulations. They insist they are therefore forced to redesign the exhaust systems on new automobiles, and that this result is one Congress specifically prohibited when it enacted the 1990 amendments to the Clean Air Act.

This appeal obliges us to reexamine the competing goals of Congress' clean air legislation, one of which is to protect manufacturers from regulatory chaos by preventing states from enacting multiple contradictory emissions standards, see H.R.Rep. No. 728, 90th Cong., 1st Sess. 21 (1967) U.S.Code Cong. & Admin.News 1967, p. 1938, and the other of which is to safeguard public health by reducing the levels of toxic pollutants spouting from automobile tailpipes into the air we all must breathe. In striking a balance between these goals, Congress elected not to link states' fuel standards to their emissions programs. For the reasons discussed below, we think this legislative balance precludes plaintiffs' claim. Hence, we affirm the judgment of the district court.

## BACKGROUND

A thorough discussion of the regulatory and legislative developments giving rise to this litigation appears in our earlier decision on this matter, *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. New York State*

*Dep't of Envtl. Conservation,* 17 F.3d 521 (2d Cir.1994) (*MVMA III* ), as well as the district court decision on remand from *MVMA III* giving rise to this appeal, *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. New York State Dep't of Envtl. Conservation,* 869 F.Supp. 1012 (N.D.N.Y.1994) (*MVMA IV*). Familiarity with those discussions is assumed; for present purposes, the briefest possible summary will suffice.

#### A. State and Federal Regulations

In general, state regulation of automotive tailpipe emissions is preempted by the federal Clean Air Act. CAA § 209(a), 42 U.S.C. § 7543(a). A unique exception was made for California, because of that state's early efforts to control its particularly severe air quality problems. CAA § 209(b) (as amended), 42 U.S.C. § 7543(b); *see* S.Rep. No. 403, 90th Cong., 1st Sess. 33 (1967) (explaining origin of preemption provision). Under § 209(b), California may adopt its own emissions standards, subject to approval by the Environmental Protection Agency (EPA), the agency responsible for enforcing the federal standards. 42 U.S.C. § 7543(b). California's power to enforce its own standards through certification and recall procedures parallel to but harsher than the EPA's means in effect that manufacturers may be forced to design two separate versions of a given vehicle—a "California" car, and a "federal" or "49-state" car. The Act also generally preempts state regulation of motor vehicle fuels, although states may establish such regulations subject to EPA approval. *See* § 211(c)(4)(A), (C), 42 U.S.C. § 7545(c)(4)(A), (C). Here too, California is exempt from federal preemption: it may regulate fuel standards without seeking approval from the EPA. *See* § 211(c)(4)(B), 42 U.S.C. § 7545(c)(4)(B).

In 1977 Congress added § 177 to the Act to permit other states desiring more stringent air quality control measures to "piggyback" on California's exemption by adopting emissions control standards "identical to the California standards for which a waiver has been granted." Clean Air Act Amendments of 1977, Pub.L. No. 95–95, § 129(b), 91 Stat. 685, 745, 750 (codified as amended at 42 U.S.C. § 7507). As part of the 1990 amendments to the Clean Air Act—and out of concern for the potential economic burden on the auto industry—Congress strengthened the "identicality" provision by adding new language to § 177. The new language specifies that a "piggybacking" state may neither limit the sale of California-certified vehicles nor "take *any action of any kind* to create, or have the effect of creating, a motor vehicle or motor vehicle engine different than a motor vehicle or engine certified in California under California standards (a 'third vehicle') or otherwise create such a 'third vehicle'." Clean Air Act Amendments of 1990, Pub.L. No. 101–549, § 232, 104 Stat. 2399, 2529 (emphasis added) (codified at 42 U.S.C. § 7507).

In September 1990 the California Air Resources Board (CARB) adopted an innovative air quality program treating vehicle emissions and fuels as two components of a single regulatory system—the Low–Emission Vehicles/Clean Fuels (LEV/CF) program. CARB Res. 90–58 (Sept. 28, 1990); Cal.Code Regs. tit. 13, §§ 1950–2317 (codification of LEV and CF regulations); *see also* Mobile Source Div. & Stationary Source Div., CARB, Initial Statement of Proposed Rulemaking for Low–Emission Vehicles and Clean Fuels (August 13, 1990). New York adopted the low emission vehicles component of California's program through DEC regulations effective in May of 1992. *See* N.Y. Comp.Codes R. & Regs. tit. 6, pt. 218. However, New York did not adopt California's fuel program and continues to permit the sale and use of high-sulfur gasoline.

#### B. High–Sulfur Fuel and the Third Vehicle Problem

Gasoline currently available in New York contains very high levels of sulfur. For example, a survey conducted by plaintiffs in the summer of 1991 found that the average sulfur levels for unleaded regular gasoline sold in New York City approached 500 parts per million (ppm), with peak levels of over 700 ppm. California's "Phase 2" gasoline specifications, in contrast, mandate a maximum sulfur content of 80 ppm. *See* Cal.Code Regs. tit. 13, § 2262.2(a). Although the Clean Air Act requires, in certain severely polluted counties of New York (those classified by the

EPA as "non-attainment areas"), the sale of federal reformulated gasolines, *see* § 211(k)(5) to (k)(6)(A), 42 U.S.C. § 7545(k)(5) to (k)(6)(A); 57 Fed.Reg. 7926, 7926–27 (March 5, 1992) (action by EPA granting Gov. Cuomo's request to apply prohibition against selling conventional gasolines); *see also* § 211(g)(2); 42 U.S.C. § 7545(g)(2) (limiting sulfur content of diesel fuel), neither federal nor· state law subjects gasoline sold in New York to the strict sulfur limitation applicable in California.

Because auto manufacturers design engines to comply with California's emissions regulations, the sulfur content of the fuel on which the vehicle will operate affects their engineering choices. High sulfur content in fuel "poisons" the noble metals that line catalytic converters, directly resulting in decreased efficiency and increased emissions. Palladium, a noble metal with certain properties particularly desirable for use in catalytic systems, is especially sensitive to sulfur poisoning during low temperature operation. Gregory S. Sims, *Durability Characteristics of Palladium Catalysts,* Society of Automotive Engineers Report No. 912369, at 3, 8–9 (1991). Therefore, it was the projected commercial availability of low-sulfur gasoline that enabled some auto designers to elect to use palladium converters on California cars.

Because such emissions control systems are less effective when operated on high-sulfur fuel, some manufacturers have concluded that they would have to redesign these systems in order to ensure compliance with an in-use testing program and an inspection and maintenance testing program that may be implemented in New York. In-use compliance testing measures a small sample of a particular engine family to see if after tens of thousands of miles of actual road use these cars meet "in-use" standards set at or very close to the ones to which they were originally certified. In-use testing is also known as recall testing because recalls may be ordered on the basis of test results. Inspection and maintenance testing is the periodic emissions test that cars in ozone non-attainment areas undergo. Its purpose is to detect those few individual cars whose emissions control systems have failed and to require their owners to undertake repairs. To satisfy in-use testing and inspection and maintenance standards, the manufacturers contend, they will have to change the type, location or precious metal loadings of catalytic converters to make them less sensitive to sulfur, costing millions and requiring new emission certificates from California.

A second design choice influenced by commercial fuel availability is the method of mounting the catalytic converter. The General Motors Corporation (GM) tells us it designed its California car with an air-tight welded mounting assembly to minimize and control vibration, but that its New York version of the car will require a high-specification flanged and bolted mounting system to promote ease of catalytic converter replacement. This is because GM anticipates having to replace more catalytic converters on California cars sold and operated in New York, in response to the onboard diagnostic system's (a vehicle's computer system that monitors the performance of emissions control systems) misleading activation of a dashboard malfunction indicator light required by California's—and hence by New York's—low emission vehicles program.

Studies conducted by GM suggest such onboard diagnostic systems will falsely illuminate at high mileage when a vehicle has been operated on high-sulfur fuel. The DEC believes these studies are flawed. *See . MVMA IV,* 869 F.Supp. at 1019 n. 9; *American Auto. Mfrs. Ass'n v. Greenbaum,* 1993 WL 443946, No. CIV.A.93–10799–MA, at *7 (D.Mass. Oct. 27, 1993) (finding studies inaccurate because: "1. the sample size is inadequate; 2. the automakers do not provide any information about the single converter that failed the test, so there is no way of telling if it is substantially similar to the converters that manufacturers will use in California; [and] 3.. the study was carried out using gasoline with a sulfur content of 600 ppm, while the proposed maximum for federal reformulated gasoline ...· is 500 ppm."), *aff'd,* 31 F.3d 18 (1st Cir.1994).

Manufacturers also urge that to comply with California standards, vehicles that use welded rather than bolted converter assemblies achieve leak-free systems that cannot

easily be replaced at a gasoline station or other service facility and still maintain near leak-free effectiveness. Despite the emissions advantages of welding, they contend, they would choose to use a flanged and bolted assembly in New York to minimize the imposition on consumers.

Although manufacturers have indicated they will not inform California purchasers that their cars should be operated only in California or on California fuels, they have admitted that modifications will be necessary for a class of California cars that will migrate from California or use cheaper non-California gas when operated in California. *MVMA,* 869 F.Supp. at 1019. This class of California vehicles, which the manufacturers will treat on a case-by-case basis, is subject to the same alleged problems that plaintiffs use to characterize New York's regulation as requiring the creation of a third vehicle. *Id.*

### C. Prior Proceedings and the District Court's Grant of Summary Judgment

Plaintiffs filed suit on July 9, 1992 claiming that New York's emissions standards violated the Clean Air Act on six counts and seeking permanent injunctive relief. Five of the six counts were disposed of in *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. New York State Dep't of Envtl. Conservation,* 810 F.Supp. 1331 (N.D.N.Y.1993) (*MVMA I*), and *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. New York State Dep't of Envtl. Conservation,* 831 F.Supp. 57 (N.D.N.Y.1993) (*MVMA II*), as modified by *MVMA III*. The remaining count was the manufacturers' claim that New York's failure to adopt the clean fuels component of California's regulations along with the low emission vehicles program would effectively compel them to modify California cars for sale in New York, in violation of § 177's "third vehicle" prohibition. The district court had initially granted summary judgment to plaintiffs on this count, *MVMA I,* 810 F.Supp. at 1345, but upon reconsideration denied summary judgment to both parties, *MVMA II,* 831 F.Supp. at 61, so this issue was not before us in *MVMA III*. Subsequently, the district court again reconsidered the third

vehicle question in light of *MVMA III* and held there were no issues of disputed fact material to the question of whether New York's regulations impermissibly require production of a third vehicle, and awarded summary judgment to defendants. *MVMA IV,* 869 F.Supp. at 1015. It is from this ruling that plaintiffs appeal.

### DISCUSSION

Summary judgment is appropriate where there are no material issues of fact in dispute. *See* Fed.R.Civ.P. 56(c). Our role is to determine if the district court properly held there were no genuine factual issues for trial regarding whether New York's adoption of California's low emission vehicles plan, without adopting its low-sulfur fuel scheme, compelled plaintiffs to create a third vehicle. In examining this question we look at the evidence in a light most favorable to plaintiffs, the nonmoving parties, and apply a *de novo* standard of review to ensure that the substantive law was correctly applied. *See Cement & Concrete Workers Dist. Council Welfare Fund v. Lollo,* 35 F.3d 29, 32 (2d Cir. 1994); *Iacobelli Constr., Inc. v. County of Monroe,* 32 F.3d 19, 23 (2d Cir.1994); *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991); *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir.1987).

### I High–Sulfur Fuel and New York Enforcement

Plaintiffs maintain that New York's promulgation of California's low emission vehicles regulations compels New York to adopt stricter in-use testing and inspection and maintenance programs to monitor and enforce compliance with the adopted standards over the life of a vehicle. They contend that such programs will violate § 177's third vehicle prohibition because manufacturers will be forced to spend millions redesigning the emission systems of low emission California cars sold in New York, that is, change the precious metal loadings of catalytic converters or move their location on the vehicle, to overcome the effects of higher sulfur fuel on such vehicles and allow them to pass those

tests. *See MVMA IV,* 869 F.Supp. at 1016–17. The district court dismissed plaintiffs' challenge as unripe, on the grounds that such regulations are "non-existent" and "hypothetical." *Id.* at 1017.

 A dispute is ripe for adjudication when there is "a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract." *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979) (quoting *Railway Mail Ass'n v. Corsi,* 326 U.S. 88, 93, 65 S.Ct. 1483, 1487, 89 L.Ed. 2072 (1945)); *North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971) ("To be cognizable in a federal court, a suit 'must be definite and concrete, touching the legal relations of parties having adverse legal interests.... It must be a real and substantial controversy....'"); *cf. Lake Carriers' Ass'n v. MacMullan,* 406 U.S. 498, 508, 92 S.Ct. 1749, 1756, 32 L.Ed.2d 257 (1972) (justiciable controversy exists where "compliance is coerced by the threat of enforcement, and the controversy is both immediate and real").

 The ripeness doctrine prevents the courts, "through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also [protects] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967); *Seafarers Int'l Union v. United States Coast Guard,* 736 F.2d 19, 26 (2d Cir.1984). Ripeness is therefore peculiarly related to when a challenge to a law is made. *See Regional Rail Reorganization Act Cases,* 419 U.S. 102, 140, 95 S.Ct. 335, 356–57, 42 L.Ed.2d 320 (1974). The doctrine prevents the premature adjudication of issues that may never arise. *See Pacific Gas & Elec. Co. v. State Energy Resources Conservation and Dev. Comm'n,* 461 U.S. 190, 203, 103 S.Ct. 1713, 1721–22, 75 L.Ed.2d 752 (1983). The applicability of the doctrine depends upon two factors: the fitness of the issues for adjudication and the hardship to

the parties that would result from withholding review. *See Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. at 1515–16.

 Plaintiffs insist that New York's adoption of the low emission vehicles standards will also require it to adopt a stricter testing program, which will result in noncompliance with the Clean Air Act. This claim is ripe, plaintiffs declare, because the immediate effect of New York's emissions standards is that manufacturers must produce cars beginning in the 1996 model year that will pass the tests. They allege additionally that making manufacturers wait to challenge these regulations only after the vehicles have been manufactured is not only contrary to ripeness principles, but also would defeat § 177's purpose of saving manufacturers from having to produce a third vehicle. While New York has announced in-use standards, it has not implemented an in-use testing program. *See* 6 N.Y. Comp. Codes R. & Regs. tit. 6, pt. 218–2.2(a)(1) (adopting Cal.Code Regs. tit. 13, § 1960.1 certification and in-use emission standards). Although plaintiffs speculate that New York will pass the necessary legislation, promulgate the appropriate regulations, and build and staff testing facilities, such programs do not presently exist. Moreover, New York currently relies on the results of California's in-use tests. *See MVMA IV,* 869 F.Supp. at 1017. The likelihood—or even the possibility—that additional tests will not be needed makes plaintiffs' claim entirely hypothetical and unfit for adjudication.

Plaintiffs' contentions regarding inspection and maintenance programs are also problematic. Plaintiffs assert that New York is required to enact inspection and maintenance regulations, but such testing will not necessarily be the same as that in California because a state's strategy for enforcing emissions standards is not itself a "standard" under § 177. Although the "piggyback" provision requires states to adopt standards identical to those in place in California to avoid preemption, there is no such identicality requirement for the mechanism employed to enforce those standards. Although the Clean Air Act requires an "enhanced" inspection and maintenance program to reduce ve-

hicle emissions, *see* § 182(c)(3), 42 U.S.C. § 7511a(c)(3), there is no requirement that the cutpoints and other features of the program match those in California. Moreover, from a practical standpoint, it is understandable that Congress did not limit states in this way—enforcement techniques will necessarily vary from state to state. New York has not yet created an inspection and maintenance program for low emission vehicles.

Because plaintiffs' arguments depend upon the effects of regulatory choices to be made by New York in the future, the district court properly declined to adjudicate this claim insofar as it relates to compelling the creation of a third vehicle. *See Pacific Gas & Elec.*, 461 U.S. at 203, 103 S.Ct. at 1721–22 ("[B]ecause 'we cannot know whether the Energy Commission will ever find a nuclear plant's storage capacity to ,be inadequate,' judicial consideration of this provision should await further developments."). Plaintiffs' contentions relating to testing standards are truly speculative since these regulatory programs have never been formalized and their effects are not felt in any concrete way by the manufacturers. *See Chemical Waste Management, Inc., v. U.S. Envtl. Protection Agency*, 869 F.2d 1526, 1532 (D.C.Cir.1989) ("[T]he mere *potential* for future injury . . . is insufficient to render an issue ripe for review.") (emphasis and omission in original) (quoting *Alascom, Inc. v. FCC*, 727 F.2d 1212, 1217 (D.C.Cir.1984)). The manufacturers are not currently suffering and are not necessarily likely to suffer any legally cognizable hardship by waiting to adjudicate this claim, if and when such programs materialize. In sum, to decide this question would be to issue an advisory opinion about the impact of non-existing testing programs on non-existing cars.

■ The district court also properly noted that New York is entitled to the presumption that if and when it enacts inspection and maintenance and recall programs, it will do so in compliance with § 177's third car prohibition. *MVMA IV*, 869 F.Supp. at 1017. If New York implements these programs—and assuming the manufacturers find New York's enforcement efforts adversely affects them—they will then be entitled to seek relief.

Thus, we decline on the grounds of ripeness to review this issue and conclude that plaintiffs will suffer no hardship by such refusal.

■ Finally, we note that plaintiffs have no standing to argue that New York's enactment of the California standards without the testing programs itself constitutes a violation of § 177. Unless a litigant suffers a personal injury that could be redressed by a decision in its favor, there is no standing to assert the claim. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992). These plaintiffs would suffer no injury—and indeed might derive a benefit—if the insufficiency of New York's enforcement practices in fact violated the Clean Air Act. Although others might be entitled to relief under such circumstances, we express no view on the merits of the question because it is not properly before us today.

## II High–Sulfur Fuel, Onboard Diagnostic Systems, and Marketing Choices

■ Plaintiffs' second "third vehicle" argument is based upon the effect of high-sulfur fuels on catalytic converters. As described above, the manufacturers maintain that the operation of California cars on New York's high-sulfur fuel will cause the onboard diagnostic system to illuminate the malfunction indicator light inaccurately. Because it will not be possible to ascertain whether a particular catalytic converter has actually failed, plaintiffs contend, the easiest and least costly approach would be to replace the catalytic converters in all such cars. Manufacturers point out that while the emission systems of California vehicles will be welded, those sold in New York will be bolted and flanged in anticipation of possibly frequent catalytic converter replacement. Manufacturers contend this circumstance gives rise to a third vehicle violation because such alterations to the emission control system are not marketing choices intended to satisfy customers or increase sales, but rather are measures forced upon them to comply with the in-use requirements of DEC's standards.

We reject this argument because nothing in the present New York low emission vehicles program mandates that manufacturers

use a flanged as opposed to a welded converter assembly or a different catalytic converter or, for that matter, to make any other design modifications. Plaintiffs are free to sell cars in New York that are absolutely identical in all respects to those certified and sold in California. Any change made in vehicles—bolting rather than welding converters, for example—is the manufacturer's choice. These so-called required modifications really reflect nothing more than manufacturers making an informed decision with respect to one of many options before them. *See MVMA IV*, 869 F.Supp. at 1019.

The district court correctly ruled that flanged mounting is simply an appealing marketing preference that might be adopted by some manufacturers because it would save consumer cost and time and that, in this way, such mounting would be comparable to the design decision of installing a more powerful heater we addressed in *MVMA III*. Plaintiffs maintained in *MVMA III* that the adoption of zero-emission vehicles requirements created a third vehicle because it required the installation of a more powerful heater in New York vehicles than California cars due to the colder climate. *See* 17 F.3d at 538. We ruled that the installation of a more powerful heater in cars to be sold in New York would not interfere with the identicality requirement or impose more burdensome administration and enforcement. *Id.* It would simply constitute a marketing decision by manufacturers, not a requirement imposed by DEC. *Id.*

Similarly, the minimal changes made here do not provide the basis for a third vehicle claim. The proposed use of a flanged assembly rather than a welded assembly is not a profound functional change to the emissions control system; instead it is a variation on the method of attaching a catalytic converter to the underside of an automobile. As such, it is a much less significant alteration than the installation of an entirely new heating system. Nor is a mere alteration of the method of attaching the converter the type of "emission control feature" alteration alluded to in *MVMA III*. *Id.* Thus, New York cannot be held by its regulation to have violated the third vehicle prohibition, if plain-

tiffs choose to use a flanged mounting as opposed to a welded mounting.

Second, the district court properly concluded, by analogy to GM's piecemeal approach to California vehicles permanently leaving that state and subsequently operating on cheaper non-California fuels, that the plaintiffs are not compelled to change from a welded to a bolted converter. These migrating vehicles—California-certified vehicles in New York and elsewhere—will be subject to the same alleged problems that plaintiffs characterize as requiring the creation of a third vehicle. Yet, manufacturers have made a business decision not to change from a welded to bolted converter on these cars. GM, the only manufacturer maintaining that it will design an alternative method of attaching the emissions control system on future vehicles, has chosen to deal with the migrating vehicles on a case-by-case basis. *See MVMA IV*, 869 F.Supp. at 1019. This approach to the migrating vehicles supports our conclusion that any decision to make or not to make production modifications on New York low emissions vehicles or any other vehicles is a marketing choice, not a requirement imposed by DEC. Summary judgment was therefore appropriately granted to the state on this issue.

### III The Effects of High–Sulfur Fuel Generally and the Legislative History

 The district court's finding that fuel-related problems could *never*, as a matter of law, result in a third vehicle, *see MVMA IV*, 869 F.Supp. at 1020, is challenged by the manufacturers as directly contrary to the clear statutory language prohibiting "any action of any kind" that has "the effect of creating" a third vehicle. The manufacturers rely upon the legislative history of the 1990 amendment to § 177 which they claim offers no support for the trial court's view and affirmatively shows that the third vehicle prohibition was intended to address the kind of fuel-related problems that are at issue here.

 Summary judgment for the defendants was proper because a third vehicle claim is not viable if it is based on a differ-

ence between California and federal fuels. A state can never violate the third vehicle prohibition so long as it satisfies the identicality requirement and "does not administer or enforce the California emission standard in a more burdensome manner than what occurs in California." *See MVMA III,* 17 F.3d at 537–38. Explaining the conferees' decision to amend § 177, Senator Chafee told his colleagues that "in adopting and enforcing California standards, no other State can have the effect of requiring carmakers to produce a vehicle different from the cars that can be sold in California." *See* 136 Cong.Rec. S16,954 (1990). As explained in a conference report presented by Senator Baucus, however, "determining what is and is not a 'third vehicle' does not require physical identicality of vehicles." *Id.* at S16,976. And, the clarification of the third vehicle prohibition continues, "the requirement to make small modifications in vehicles in use to assure their continuing compliance with their certified emission limits" does not constitute an undue burden on manufacturers or require the production of a third vehicle. *Id.* Likewise, modifications that might result from the difference in the quality of fuel sold in New York and California do not give rise to a third vehicle violation.

The district court properly relied on our prior characterization of the third vehicle prohibition as " 'designed to reinforce the identicality requirement' of the emission standards adoption provision." *MVMA IV,* 869 F.Supp. at 1020 (quoting *MVMA III,* 17 F.3d at 536). As we have already held, the "plain language of § 177 not only provides that New York need not adopt California's [clean fuels] plan, it actually precludes New York's adoption of such plan under this provision." *MVMA III,* 17 F.3d at 532. The legislative history of the 1990 amendment to § 177 supports this view. Congress expressly rejected linking California's low emissions vehicles standards with the adoption of California's fuel requirements. *Compare* Memorandum from Rep. Dingell to Energy and Commerce Conferees on S. 1630, at 4 (Sept. 26, 1990) (describing an effort to add language to the 1990 amendments requiring states adopting California's motor vehicle standards to adopt clean fuel requirements)

*and* Proposed Conference Agreement on Mobile Sources, 10/4/90 Draft of House 9/26/90 Offer Re: § 177 Opt In (proposing amendment to § 177 requiring a linkage between the adoption of California vehicle and fuel standards) *with* Summary of Agreement on Title II, Mobile Sources (Oct. 10, 1990) (Staff report indicating that such language was deleted: "The staff agreed to delete all fuel availability provisions regarding opt-in. In short, § 211(c)(4)(C) would continue to apply, under its own terms, in regards to fuel availability."). Since no linkage provision exists in the final statutory language, Congress maintained the Act's historic separate regulation of emission standards and fuels. *See MVMA IV,* 869 F.Supp. at 1020 (noting that we had "clarified beyond peradventure [that] Congress has elected to treat its fuel and emissions anti-pollution initiatives separately"). Therefore, the district court properly ruled that alterations stemming from differences in fuels—as opposed to differences in emissions standards—cannot amount to a third vehicle violation.

## IV Discussion

 Finally, manufacturers declare it was an abuse of discretion to refuse to permit them to proceed with scheduled depositions of key witnesses with information central to the summary judgment motion. They also insist that the district court, with respect to whether alleged design modifications would require re-certification under the California regulations, improperly gave dispositive weight to the disputed affidavit of California Air Resources Board engineer Duc Nguyen and "disregarded the ... much more definitive Declarations by GM's manager of emissions compliance." They further aver that the district court erred by resolving disputed factual matters in favor of the defendants.

This argument mischaracterizes the district court's decision. It did not abuse its discretion in denying plaintiffs' motion to proceed with depositions to flesh out the certification issue because that issue was not material to the case. It considered the substance of plaintiffs' and defendants' affidavits on the subject, only to conclude that it need

not rely upon either party's factual statements regarding the certification process. *MVMA IV,* 869 F.Supp. at 1015, 1018–19. Moreover, none of the instances of alleged factual disputes was material to the decision. Thus, this contention lacks merit.

### CONCLUSION

For the foregoing reasons, we affirm the district court's order dismissing count two of the plaintiffs' complaint and granting summary judgment in favor of defendants.