**AMERICAN AUTOMOBILE MANUFACTURERS ASSOCIATION and Association of International Automobile Manufacturers, Inc., Plaintiffs**

**v.**

**John P. CAHILL, Acting Commissioner of the New York Department of Environmental Conservation and Dennis C. Vacco, Attorney General of the State of New York, Defendants.**

No. 97–CV–444(LEK/DNH).

United States District Court, N.D. New York.

Aug. 5, 1997.

Mayer, Brown & Platt, New York City (Philip A. Lacovara, of Counsel), for Defendants.

New York State Department of Law, Albany, NY (John J. Sipos, of Counsel), Dennis C. Vacco, Office of the Attorney General, State of New York, Environmental Bureau, Albany, NY (James A. Tierney, Asst. Attorney General, of Counsel), for Defendants.

Law Office of John W. Caffry, Glens Falls, NY (Louise G. Roback, of Counsel), for Amici Curiae Environmental Advocates, Natural Resources Defense Council, And The American Lung Association.

Paul A. Crotty, Corporation Council for the City of New York, New York City (Marjorie Fox, Asst. Corp. Council, of Counsel), for Amicus Curiae The City of New York.

### MEMORANDUM–DECISION AND ORDER

KAHN, District Judge.

This action was originally filed on February 10, 1997 in the Southern District of New York. Upon the defendant's application, the action was transferred to the Northern District of New York on March 31, 1997.

Plaintiffs, the American Automobile Manufacturers Association ("AAMA") and the Association of International Automobile Manufacturers, Inc. ("AIAM") have brought this action under 42 U.S.C. § 1983 and 42 U.S.C. § 7604. AAMA and AIMA (collectively, the "manufacturers") seek declaratory and injunctive relief against the defendants John P. Cahill, the Acting Commissioner of the New York Department of Environmental Conservation (the "Commissioner") and Dennis C. Vacco, the Attorney General of the State of New York (the "Attorney General"). The plaintiffs seek to enjoin the defendants from enforcing legislation which requires the sale of "zero emissions vehicles" ("ZEVs") commencing in the 1998 model year.

Presently before the Court is the plaintiff's motion for partial summary judgment on the first, second, third, and fourth counts of the complaint. Also before the Court is the defendants' motion to dismiss or in the alternative for summary judgment on all counts.

## I. BACKGROUND

This action is not the first conflict between the parties regarding the issue of automotive emissions and the Clean Air Act (the "Act" or "CAA"). 42 U.S.C. §§ 7401–7671q (1995). The parties in the present action were involved in a prior action which led to several published opinions including: *Motor Vehicle Mfrs. Ass'n*[1] *v. New York State Dep't of Envtl. Conservation*, 810 F.Supp. 1331 (N.D.N.Y.1993) ("*MVMA I*"); the reconsideration of that order in *Motor Vehicle Mfrs. Ass'n v. New York State Dep't of Envtl. Conservation*, 831 F.Supp. 57 (N.D.N.Y.1993) ("*MVMA II*"); and the subsequent appeal *Motor Vehicle Mfrs. Ass'n v. New York State Dep't of Envtl. Conservation*, 17 F.3d 521 (2d Cir.1994) ("*MVMA III*"). Upon remand from *MVMA III*, the fourth opinion *Motor Vehicle Mfrs. Ass'n v. New York State Dep't of Envtl. Conservation*, 869 F.Supp. 1012 (N.D.N.Y.1994) ("*MVMA IV*") was rendered which was also appealed; *Motor Vehicle Mfrs. Ass'n v. New York State Dep't of Envtl. Conservation*, 79 F.3d 1298 (2d Cir. 1996) ("*MVMA V*"). For those wishing a

detailed background of the Act and its relationship to automotive emissions, the Court refers to the Second Circuit decision of *MVMA III*. For purposes of this action, a brief overview of the Act as discussed in *MVMA III* should prove helpful.

### A. The Clean Air Act

"The original Clean Air Act, passed by Congress in 1955, was aimed primarily at increasing federal research and assistance in air pollution prevention." *MVMA III*, 17 F.3d at 524. "It made no provision for federal motor vehicle emission standards." *Id.* (citing Air Pollution Control–Research and Technical Assistance Act of 1955, Pub.L. No. 84–159, 69 stat. 322). Since several individual states, had begun to adopt motor vehicle emissions standards, Congress decided it would be prudent to establish a national standard to avoid " 'chaos insofar as manufacturers, dealers, and users are concerned.' " *Id.* (citing S.Rep No. 192, 89th Cong., 1st *Sess.* 5–6 (1965)). Federal standards were passed in 1965 and in 1967 and states were preempted from developing their own motor vehicle emission standards. *Id.* at 525. However, an exception from preemption was made for California due to what was characterized as " 'unique problems and pioneering efforts' " in the area of motor vehicle emissions. *Id.* (citing S.Rep. No. 403, 90th Cong., 1st Sess. 33 (1967); see also 42 U.S.C. § 7542(b), CAA § 209(b)).

In 1970, sweeping revisions were made to the Act and national ambient air quality standards ("NAAQS") were created. NAAQS were established for carbon monoxide, ozone, lead, nitrogen dioxide, sulfur dioxide and particulates. *See* 40 C.F.R. Part 50. The Act also "required even more stringent uniform emission standards for new motor vehicles." *Id.* In the continuing effort to reduce nationwide air pollution and to aid states in meeting NAAQS, in 1977, Congress saw fit to allow individual states to " 'piggy back' onto California's [automotive emissions] standards, if the state's standards 'are identical to the California standards for which a waiv-

---

**1.** The entity that was The Motor Vehicle Manufacturers Association of the United States, Inc. is now called the American Automobile Manufacturers Association.

er has been granted for such model year.' "[2] *MVMA III*, 17 F.3d at 525 (citing Publ. L. No. 95–95, § 129(b), 91 Stat. 685, 750; *see* 42 U.S.C. § 7507, CAA § 177). While eager to reduce air pollution, Congress still held the "desire not to burden manufacturers unduly with myriad state emissions regulations." *Id.* at 531. As a result, in order for an individual state to utilize the more stringent automotive emissions standards, "California must adopt its standards two years in advance of such year, California must receive a waiver for its standards, and the adopting state must adopt California standards at least two years before the model year.' " *Id.* at 525 (citations omitted).

The Act was amended once again in 1990. Under Title I of the 1990 Act which is primarily concerned with stationary pollution sources, "[t]he several states are vested with the primary responsibility for attaining and maintaining the NAAQS through the development and operation of a state implementation plan (SIP)." *Id.* (citing 42 U.S.C. § 7408(a)(1)(a), CAA Title I § 108). Each state's SIP is submitted to the EPA and must explain how the state plans on reducing or maintaining the concentration of pollutants in order to meet the NAAQS. *Id.*

State implementation plans discuss both stationary and mobile sources of pollution.

Title II of the Act deals with mobile sources, primarily motor vehicles, and seeks to regulate the "emissions of carbon monoxide (CO), hydrocarbons or volatile organic compounds (VOCs) and nitrogen oxides (NO subx)."[3] *Id.* The preemption of state regulation of new automobiles survived the 1990 amendments. *Id.* (citing 42 U.S.C. § 7543(a), CAA § 209(a)). As before, California enjoys the only exception to the preemptive effect of the Act but must still seek approval from the EPA in order to obtain a waiver.[4] *Id.* at 527. "The effect of the Clean Air Act is that motor vehicles manufactured for sale in the United States must be either 'federal cars'—certified to meet federal vehicle emission standards as set by the EPA—or 'California cars'—certified to meet that state's standards." *Id.* at 526–27.

"Many states, including New York, are in danger of not meeting increasingly stringent federal air pollution limits."[5] *Id.* In order to ensure enforcement, Congress has directed that the EPA impose mandatory sanctions on states that fail to meet NAAQS.[6] 42 U.S.C. § 7509, CAA § 179. As discussed earlier,

**2.** What actually constitutes a "model year" is often not readily determined. "The EPA issued an Advisory Circular that an annual production period for any specific model within an engine family commences (1) when a vehicle or engine designated for a particular year is 'first produced,' or (2) on January 2 of the calendar year prior to the model year, whichever date is later." *MVMA III*, 17 F.3d at 534–35. The Second Circuit determined that the term "model year" should be applied on an industry wide basis. *Id.* at 535. Therefore, the 1998 model year, which is central to this controversy, "may begin as early as January 2, 1997, and extends to December 31, 1998." Flint Aff. ¶ 13.

**3.** Hyrdocarbons and nitrogen oxides combined with sunlight form ozone, or "smog." *Id.*

**4.** The Second Circuit presented the method by which California obtains a waiver:

The California Air Resources Board (CARB) submits an application upon determining that its proposed standards 'will be, in the aggregate, at least as protective of the public health and welfare as applicable Federal standards. The Administrator can deny the waiver request if she finds (1) that the protectiveness determination of California is arbitrary or capricious,

(2) that California does not need separate standards to meet 'compelling and extraordinary conditions,' or (3) California's 'standards and accompanying enforcement procedures are not consistent with [§ 202(a) of the Act].' Those standards are deemed not to be consistent with § 202(a) 'if there is inadequate lead time to permit the development of technology necessary to meet the proposed requirements, giving appropriate consideration to the cost of compliance within [the proposed] time frame. Were California simply to change its standards, and such changes were found to be within the scope of an existing waiver, California need not submit a new waiver application. *Id.* (citations omitted).

**5.** The ozone levels in New York City are among the highest in the nation and are surpassed only by Los Angeles and Houston. Mem. of Law of Amici Curiae Environmental Advocates, Natural Resources Defense Council, and The American Lung Assoc. at 8 (citing 56 Fed.Reg. 56804 (Nov. 6, 1991)).

**6.** Possible sanctions include the prohibition of federal highway funding applicable to a nonattainment area. 42 U.S.C. § 7509(b), CAA § 179(b).

the "piggy-back" provision of § 177 was designed to provide states with another tool in their efforts to meet the NAAQS. "This opt-in authority . . . is carefully circumscribed to avoid placing an undue burden on the automobile manufacturing industry." *Id.* In order take advantage of § 177, "(1) an opt-in state must adopt standards that are identical to California's; (2) California must receive a waiver from the EPA for the standards; and (3) both California and the opt-in state must adopt the standards at least two years before the beginning of the automobile model year to which they apply." *Id.* (citing 42 U.S.C. § 7507, CAA § 177). In 1990, Congress added two more restrictions to the opt-in requirements. "First, Congress added new language providing that § 177 shall not be construed as authorizing an opt-in state to limit the sale of California-certified vehicles." *Id.* at 527–28. "Second, it forbade opt-in states from taking any action that has the effect of creating a car different from those produced to meet either federal or California emission standards, a so called 'third vehicle.'"[7] *Id.* (citing Clean Air Act Amendments of 1990, Pub.L. No. 101–549, § 232, 104 Stat. 2399, 2529).

### B. *California's Emission Regulations*

The California Air Resources Board ("CARB") is the entity responsible for emissions regulations for the State of California. In order to achieve the California legislature's goal of a 55 percent reduction in organic emissions by the year 2000, CARB established two programs, one being a low-emission vehicle program ("LEV") and the other a clean fuels ("CF") program which became effective in 1991. *Id.* at 528. While both of these programs were the subject of the prior actions before this Court and the Second Circuit, the present case involves only the LEV program.

CARB's LEV program divides the covered motor vehicles into four classes: "(1) Transitional Low–Emission Vehicles ('TLEVs'), (2) Low Emission Vehicles ('LEVs'), (3) Ultra Low Emission Vehicles ('ULEVs'), [and] (4) Zero–Emission Vehicles ('ZEVs')." *Id.* (citing Cal.Code Regs. Title 13 § 1960.1(g)(2)). Each category is progressively more strict in standards for non-methane organic ("NMOG") emissions, and a ZEV, produces no emissions directly from the vehicle.[8]

A manufacturer has the option of selling automobiles from each category but must meet an NMOG "fleet average" for the vehicles sold during a given model year. Each year the standards become more stringent. *Id.* In addition, manufacturers can meet the required fleet average standard through a credit system which allows manufacturers to earn additional credit for selling more LEVs than required to meet the fleet average. *Id.* "Credits [may] be banked internally to offset future short-falls or sold to other manufacturers unable to meet their fleet average." *Id.*

While manufacturers have flexibility in deciding upon a mix of the four categories of vehicles they wish to sell under the California

---

7. Section 177 provides:

Notwithstanding section 7543(a) of this title, any State which has plan provisions approved under this part may adopt and enforce for any model year standards relating to control of emissions from new motor vehicles or new motor vehicle engines and take such other actions as are referred to in section 7543(a) of this title respecting such vehicles if—

(1) such standards are identical to the California standards for which a waiver has been granted for such model year, and

(2) California and such State adopt such standards at least two years before commencement of such model year (as determined by regulations of the Administrator).

Nothing in this section or in subchapter II of this chapter shall be construed as authorizing any such State to prohibit or limit, directly or indirectly, the manufacture or sale of a new motor vehicle or motor vehicle engine that is certified in California as meeting California standards, or to take any action of any kind to create, or have the effect of creating, a motor vehicle or motor vehicle engine different than a motor vehicle or engine certified in California under California standards (a "third vehicle") or otherwise create such a "third vehicle".

42 U.S.C. § 7507.

8. Currently, the only ZEVs available are electric or battery cars. While electric vehicles do not emit pollutants, they must be charged by electric facilities which often burn fossil fuels to generate power. Electric power facilities that burn fossil fuels emit pollution and are covered as stationary sources under the Act.

plan, the only limitation on that flexibility is the ZEV sales percentage requirement. Under the 1991 CARB regulations, beginning in the model year 1998, "2 percent of all vehicles certified for sale in California must be ZEVs, with the rate increasing to 5 percent in 2001 and to ten percent in 2003." [9] *Id.* The ZEV requirement also has a credit system that works in the same way as the credit system for fleet average discussed above which allows manufacturers to accumulate credits and buy or sell credits with other manufacturers. *Id.* In March of 1996, California abandoned its ZEV sales mandate for the years 1998 to 2002.[10] CARB replaced the sales mandate with individual Memorandums of Agreement ("MOAs") with the seven largest manufacturers. The MOAs are binding agreements with the manufacturers which fall outside of the realm of the Act and require specific numbers of ZEVs to be sold during the model years 1998 through 2002. Substantial penalties will be levied against manufacturers that fail to meet the requirements under the MOAs.

### C. *The Present Action*

On April 28, 1992, the New York State Department of Environmental Conservation ("DEC") adopted the New York Low Emissions Vehicle Program, 6 N.Y.C.R.R. Part 218, which spurred the earlier litigation between the present parties discussed earlier. The New York ZEV legislation is essentially identical to the California emissions standards which were adopted by CARB in 1991.

The specific section of the Low Emission Vehicle Program at issue in this case is the "Zero Emission Vehicle Sales Mandate" (the "ZEV regulations" or "ZEV sales mandate") codified at 6 N.Y.C.R.R. § 218–4.1. Specifically, the ZEV regulations provide: "Commencing in model year 1998, each manufacturer's sales fleet of passenger cars and light-duty trucks from 0–3750 lbs. [ ] shall, at minimum, contain the following percentage of ZEV's . . . ." *Id.* The statute further sets forth that for the model years 1998 through 2000, ZEV sales must comprise 2% of the new vehicle sales in New York. *Id.* The percent requirement is based upon the number of sales and leases during the model year 1998. As an approximation, the covered manufacturers sold or leased approximately 390,000 vehicles in New York during the model year 1996. Flint aff. ¶ 13. Therefore, taking 2% of that figure, the manufacturers would be required to sell approximately 7,800 ZEVs during the model year 1998. *Id.* The percentage rises to 5% during the 2001–2002 model years and up to 10% from 2003 and beyond. *Id.*

Also within the New York regulations is the marketable credit system discussed earlier which enables manufacturers to accumulate and purchase or sell ZEV credits. 6 N.Y.C.R.R. § 218–4.2(a) and (e). "Manufacturers which sell fewer ZEVs than required, in New York State, in a given model-year shall make up the deficit by the end of the next model-year, by selling an additional number of ZEVs in New York State, equal to their deficit . . . ." 6 N.Y.C.R.R. § 218–4.2(b). Manufacturers who fail to meet the

---

**9.** Initially, the ZEV quota only applies to manufacturers that sell more than 35,000 vehicles annually in California. The manufacturers that fall into this category include: General Motors (GM), Chrysler, Ford, Honda, Toyota, Nissan, and Mazda. *See* Mem. of Amici Curiae Environmental Advocates, Natural Resources Defense Council, and the American Lung Association at 7. However in the year 2003, manufacturers selling as few as 3,000 were also bound to the ZEV requirement.

**10.** On March 28, 1996, after obtaining the results from a panel of experts on battery technology, CARB repealed the ZEV mandate for the model years 1998–2002. CARB reached this conclusion based upon their findings that battery technology, while available, was not adequate to meet the needs of consumers for the model year 1998. According to CARB, the problems with battery

technology include poor performance, limited range, and high price. CARB decided that the problems with lead-acid batteries would be rectified with the introduction of more sophisticated batteries which are close to being introduced on a large scale by the manufacturers. Concerned that vehicles produced before better technology was available would taint consumer's views regarding electric vehicles, CARB found it to be prudent to forego the ZEV mandate for model years 1998 through 2002. However, the mandate for the model year 2003 is still completely intact. State of California Air Resources Board, Resolution 96–12, at 6–7. Furthermore, California has entered into binding agreements with the manufacturers known as MOAs to test existing ZEVs in specific quantities throughout the 1998–2002 model years.

New York ZEV requirement for a given model year can carry over the deficit forward to the following year without penalty. A deficit can be made up during the next year through increased production or the purchase of credits.

Plaintiffs allege a total of six causes of action. First, the manufacturers contend that New York State's ZEV regulations are preempted by § 209(a) of the Clean Air Act. 42 U.S.C. § 7543(a). Second, the plaintiffs assert that New York's ZEV regulations are not identical to the California emission standards for the same model year and are therefore in violation of § 177 of the Act. 42 U.S.C. § 7507. Third, AAMA and AIMA allege that the ZEV regulations are preempted by § 249 of the Act. 42 U.S.C. § 7589. The fourth count claims that New York's ZEV regulations are subject to implied preemption because they stand as an obstacle to the objectives of Congress when § 177 was enacted. 42 U.S.C. § 7507. In the fifth claim brought under 42 U.S.C. § 1983, the plaintiffs contend that New York's regulations violate the Due Process Clause of the Fourteenth Amendment. Finally, the manufacturers allege that the ZEV regulations violate the Commerce Clause of Article I, Section 8 of the United States Constitution.

Both the plaintiffs and defendants have moved for summary judgment. Pursuant to Fed.R.Civ.P. 56, the manufacturers have moved for summary judgment on the first four counts of the complaint. The defendants have moved to dismiss all counts, or in the alternative, moved for summary judgment on all counts pursuant to Fed.R.Civ.P. 12(b) and 56. The Commissioner and the Attorney General assert that the plaintiffs' claims are barred by the applicable statute of limitations, Res Judicata, and Collateral Estoppel. Defendants further contend that the plaintiffs have failed to follow the necessary statutory prerequisites for this Court to exercise jurisdiction over claims arising under the Citizen suit provision of the Act. 42 U.S.C. § 7604.

## II. *DISCUSSION*

### A. *Jurisdictional Issues*

The defendants argue that this Court lacks jurisdiction to hear this action under the doctrines of Res Judicata, Collateral Estoppel, and due to the plaintiff's failure to follow the necessary statutory prerequisites. Because a lack of jurisdiction would prevent this Court from considering this action, the jurisdictional claims will be addressed first.

### 1. **Statute of Limitations**

■ Defendants contend that the plaintiffs' claim is barred by the statute of limitations of three years for all civil rights actions. *See* 42 U.S.C. § 1983. New York adopted the LEV program on April 28, 1992, over five years ago, and since that time, it has remained unchanged. Defendants further argue that the changes made by California were done within the scope of the existing EPA waiver and has no effect upon New York. Thus, defendants contend that the statute of limitations has passed. Plaintiffs contend that this action is not challenging the adoption of the April 28, 1992 ZEV mandate. Rather, plaintiffs assert that they are challenging the power of New York State to enforce the ZEV mandate since California, the acknowledged model state, has changed its ZEV sales requirement.

It is undisputed that the statute of limitations applicable to this § 1983 action is three years. *Owens v. Okure*, 488 U.S. 235, 251, 109 S.Ct. 573, 582, 102 L.Ed.2d 594 (1989). Furthermore, it is undisputed that a § 1983 claim accrues when a plaintiff " 'knows or has reason to know of the injury which is the basis of his action.' " *Barrett v. United States*, 689 F.2d 324, 333 (2d Cir.1982) (quoting *Singleton v. City of New York*, 632 F.2d 185, 191 (2d Cir.1980), cert. denied, 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 347 (1981)). The central issue to be determined here is whether or not New York State is bound to eliminate its ZEV requirement for the model years 1998 to 2002 because California has changed its policy. CARB did not abandon its ZEV sales requirement until March 28, 1996. The Court holds that the plaintiffs had three years from that date in which to file this action and therefore this action has been commenced in a timely manner.

### 2. **Citizen Suit Provision**

Defendant's second jurisdictional challenge involves the citizen suit provision of the Act. *See* 42 U.S.C. § 7604. Under the Act,

any person may commence a civil action on his [or her] own behalf—

(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation.

42 U.S.C. § 7604(a)(1). The Act further provides that plaintiffs who wish to bring an action under the above section may not file the action "prior to 60 days after the plaintiff has given notice of the violation (i) to the Administrator, (ii) to the State in which the violation occurs, and (iii) to any alleged violator of the standard, limitation, or order . . . ." 42 U.S.C. § 7604(b). Defendants contend that the plaintiffs have failed to follow the requirements of the citizen suit provision. Furthermore, defendants argue that the subject matter of the action does not fall under those permitted by the citizen suit provision of the Act. Plaintiffs do not dispute the defendants' assertions. However, the manufacturers contend that the second jurisdictional basis, 42 U.S.C. § 1983, is not challenged by the defendants and provides a sufficient jurisdictional foundation for the claims asserted.

■ Under 28 U.S.C. § 1331, the "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Counts Five and Six of the complaint seek relief under 42 U.S.C. § 1983 and allege that the actions of the defendants violate the Due Process clause of the Fourteenth Amendment as well as the Commerce Clause. Furthermore, this action involves a novel question of federal law since the Court must interpret various sections of the Clean Air Act. Therefore, jurisdiction exists and the Court will now turn to the merits.

### 3. Res Judicata

The defendants contend that all six of the claims raised by the plaintiffs were previously argued or could have been raised in the prior court actions and therefore these claims are barred by the doctrine of res judicata. Alternatively, the defendants contend that count three involving § 249, count five involving Due Process, and count six involving the Commerce Clause should be dismissed under Fed.R.Civ.P. 12(b)(6) on res judicata grounds. In response, the manufacturers argue that the claims arising under §§ 209 and 177 are not the same as those raised in the prior proceedings and therefore, dismissal of the entire claim based on res judicata is inappropriate. In addition, plaintiffs contend that counts three, five, and six are also not foreclosed.

■ "Res judicata operates as 'claim preclusion.'" *Interoceanica Corp. v. Sound Pilots, Inc.*, 107 F.3d 86, 90 (2d Cir.1997). "Generally, a judgment in an action 'precludes the parties . . . from relitigating issues that were or could have been raised in that action.'" *Id.* (quoting *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 101 S.Ct. 2424, 2428, 69 L.Ed.2d 103 (1981)).

More specifically: 'the doctrine of res judicata provides that when a final judgment has been entered on the merits of a case, [i]t is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.'

*Id.* (quoting *Securities and Exch. Comm'n v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1463 (2d Cir.1996) (quoting in turn *Nevada v. United States*, 463 U.S. 110, 129–30, 103

S.Ct. 2906, 2918, 77 L.Ed.2d 509 (1983) (internal quotations omitted)). "It must first be determined that the second suit involves the same 'claim'—or 'nucleus of operative fact'—as the first suit." *Id.* (quoting *Apparel Art Int'l, Inc. v. Amertex Enters., Ltd.,* 48 F.3d 576, 583 (1st Cir.1995)). "Whether or not the first judgment will have preclusive effect depends in part on whether the same transaction or connected series of transactions is at issue, [and] whether the same evidence is needed to support both claims." *Id.* (citing *National Labor Relations Bd. v. United Technologies Corp.,* 706 F.2d 1254, 1260 (2d Cir.1983)). The Second Circuit further noted that in order to "ascertain whether two actions spring from the same 'transaction' or 'claim,' we look to whether the underlying facts are 'related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a ·unit conforms to the parties' expectations or business understanding or usage." *Id.* at 90–91 (citing Restatement (Second) of Judgments § 24(b)).

> With respect to the determination of whether a second suit is barred by res judicata, the fact that both suits involved essentially the same course of wrongful conduct is not decisive; nor is it dispositive that the two proceedings involved the same parties, similar or overlapping facts, and similar legal issues. A first judgment will generally have preclusive effect only where the transaction or connected series of transactions at issue in both suits is the same, that is where the same evidence is needed to support both claims, and where the facts essential to the second were present in the first. If the second litigation involved different transactions, and especially subsequent transactions, there generally is no claim preclusion.

*Id.* at 91 (quoting *First Jersey Secs.,* 101 F.3d at 1463–64 (2d Cir.1996) (internal quotations and citations omitted)).

■ The action before the Court, while certainly similar to the prior actions, is by no means identical. The central focus of the action involves one very distilled question: Does New York have the right to enforce its ZEV sales requirement under the Clean Air Act since California, the State which New York is obligated to follow for its emission standards, has abandoned its ZEV sales mandate for the model years 1998 through 2002? Clearly, this question did not even exist during the prior litigation since California abandoned its· ZEV sales mandate on March 28, 1996. Furthermore, the evidence relied upon, while it may be similar in nature, cannot be the same as that used in the prior action because of the essentially different issue before the Court. *See id.* at 91. Finally, the facts which will be used to support the plaintiffs' claims were not present in the first action since the question at issue did not yet exist. *Id.* In short, the issue of whether or not New York must be bound by a change in the California ZEV sales mandate was not before nor could have been before the Court during the prior action. *Id.* at 90. Accordingly, dismissal of the entire complaint on res judicata grounds is inappropriate.

### a. Count Three—Preemption of § 249

Defendants argue that plaintiffs' claim based upon § 249 of the Act which contains a prohibition on sales or production mandates is barred by the doctrine of res judicata. Defendants contend that this argument was available to the plaintiffs during the prior action yet was not raised despite the fact that one of the major issues in the prior litigation was the propriety of the ZEV sales mandate. Plaintiffs submit that the EPA rulemaking standards for the Clean Fleet Program under § 246 and the California Pilot Test Program under § 249 ·were not finalized until September, 1994. Because the finalized rulemaking standards constitute a change in the material facts since the prior litigation, plaintiffs argue that res judicata does not apply.

■ The plaintiffs assert that § 249 preempts New York's ZEV mandate. Thus, it is clear that this argument is not based upon changes to California's ZEV sales mandate and how they may effect the New York regulations, but is rather a direct attack on New York's sales requirement in its original form. "Claim preclusion prevents parties ... from raising legal theories, claims for relief, or defenses which could have been raised in the prior litigation, even though

such claims were never actually litigated in the prior case." 18 Moore's Federal Practice ¶ 131.13[2] at 131–26 (1997). The question of whether or not New York's ZEV sales mandate violated the Act was the subject of two appeals and five published opinions. The Second Circuit upheld New York's sales mandate. While the plaintiffs' § 249 theory may not have been relied upon in those actions,[11] it is a theory involving "issues that were or could have been raised in [the prior] action[s].'" *Interoceanica*, 107 F.3d at 90 (quoting *Federated Dep't Stores*, 452 U.S. at 398, 101 S.Ct. at 2428). Therefore, the plaintiffs' claim under § 249 is precluded by the doctrine of res judicata.

### b. Due Process Clause

In the fifth count of the complaint, the plaintiffs allege that the ZEV regulations violate their right to Due Process under the Fourteenth Amendment. Specifically, plaintiffs contend that "forcing automotive manufacturers to incur substantial penalties for failing to meet a percentage ZEV requirement is an arbitrary and capricious deprivation of their liberty interests and their property." Compl. ¶ 65 at 19. Plaintiffs argue

that by forcing them to build and sell ZEVs which do not operate adequately in cold temperatures found in New York and for which there is no market, defendants are depriving them of their property in violation of their Due Process rights. Defendants assert that the plaintiffs were obligated to raise this Due Process claim in the prior litigation and since they did not, they are prevented from doing so in the present action by the doctrine of res judicata.

In response, the plaintiffs argue that the Due Process claim was not ripe at the time of the prior action and has since become viable. In support of this, plaintiffs cite studies and admissions which they allege show the minimal environmental impact of ZEVs and the allegations that ZEV technology has not progressed as far as it should have in order to satisfy consumers. With this new information, plaintiffs submit that the ZEV requirement places an irrational and undue burden on them and would deprive them of their constitutionally protected property.

Specifically, the manufacturers assert that the variation in climate between California and New York requires extensive modification to the California-certified ZEVs.[12] The

---

**11.** The plaintiffs argue that this theory was not available to them at that time. However, since § 249 was a part of the 1990 amendments to the Act, it is clear that this argument was indeed available.

Furthermore, the Court is of the opinion that the plaintiffs' assertion that New York has "opted in" to the restrictions set forth under § 249 is untenable. First, § 249 is a pilot program designed by Congress that required California to develop clean fuel vehicles and clean alternative fuels programs. 42 U.S.C. § 7589 c(1) and (2). There is no mention that opt-in states could be effected. Second, § 249 argument is similar to the assertion set forth by the plaintiffs in the prior actions in arguing that New York had to adopt the California Clean Fuel program when adopting the LEV program. *See MVMA III,* 17 F.3d at 538. This argument was ultimately dismissed by the Court of Appeals. The Court does not see any distinction between the two arguments in the sense that New York is not required to adopt § 249, the California Pilot Test Program any more than it was required to adopt the Clean Fuels program. Finally, while it is certainly true that language prohibiting a sales or production mandate is present in the Act, *see* 42 U.S.C. § 7589(f)(4), California ultimately obtained a waiver from the EPA allowing the ZEV sales requirements.

**12.** A similar argument was raised in the prior litigation and was eventually heard before the Second Circuit. Plaintiffs asserted that the changes that would have to be made to the California-certified electric vehicles would create a "third vehicle," in other words, a vehicle that was neither a California or a Federal vehicle. As discussed earlier, the creation of a "third vehicle" violates § 177 of the Act. In *MVMA III*, the Second Circuit was confronted with the issue of whether or not the installation of a more powerful heater in California-certified ZEVs to accommodate the colder New York climate rose to the level of creating a "third vehicle." The Second Circuit found that "whatever heater the manufacturers choose to install on cars sold in New York is a marketing choice of theirs and not a requirement imposed by the DEC." 17 F.3d at 538. However, the Court further noted:

Whether we could so easily reject a third-vehicle claim as to vehicles meeting California's requirements if some aspect of New York's climate required alteration to the emission control features of the automobile *or substantially impaired the ability of the vehicle to perform basic transportation functions* are issues we need not consider on this record. *Id.* (emphasis added). Undoubtedly, this language served as inspiration for plaintiffs' Due Process argument.

manufacturers argue that cold temperatures and snow covered roads severely limit the range of electric vehicles so as to make them infeasible for New York State. Plaintiffs also argue that the impact of ZEVs on air quality is minimal.[13] Defendants disagree with the manufacturers' assessment of the viability of the existing California-certified electric cars. Defendants contend that the California-certified ZEVs would perform adequately in New York State with only slight modification to the thermal management of the lead-acid batteries used in most ZEVs and that a market exists.

■ Defendants argue that under the Due Process claim, the plaintiffs are suing the parties under the same operative facts as existed in the prior litigation. In order to survive the res judicata challenge, the plaintiffs must demonstrate that the facts being used to support the claim today were not available at the time the first action was brought. *See Interoceanica*, 107 F.3d at 91 ("A first judgment will generally have preclusive effect only where the transaction or connected series of transactions at issue in both suits is the same, that is where the same evidence is needed to support both claims, and where the facts essential to the second were present in the first.")

The most significant fact that supports the plaintiffs' argument is that CARB has chosen to abandon its ZEV requirement due to their conclusion that the technology to satisfy customers on a large scale does not exist for the model year 1998. *See* CARB Final Statement of Reasons for Rulemaking Including Summary of Comments and Agency Response at 59. This information, of course, was not available to the plaintiffs before the prior litigation. Furthermore, studies regarding the viability of lead-acid powered ZEVs in cold weather were available in 1994, but not earlier. *See Cold Weather Experi-*

*ence with GM Impact*, James N. Ellis, (Proceedings of NESEA S/EV 94, October 1994), *Cold Weather Effects on Vehicle/Battery*, Chuck Risch, July/August 1994 (testing done on Ford Ecostar ZEV). These tests found that the GM Impact (now known as the EV-1) had a mere 12 miles of range at 0 degrees Fahrenheit, a reduction of 85% from a range of 80 miles at 70 degrees. Similarly, the range for the Ford Ecostar dropped from 25 miles at 70 degrees to 7 miles at 0 degrees.

■ While these studies have been called into question by other studies,[14] that inquiry is not relevant to the question currently before the Court. Rather, the Court is obligated to determine whether the manufacturers had enough information at their disposal to bring a Due Process claim against the defendants in the prior action. In short, the answer to that inquiry is no. An argument based on the theory that the manufacturers were being deprived of their property by being forced to sell ZEVs would have been premature; it was too early to determine if the technology would be ready for the model year 1998. Therefore, the doctrine of res judicata does not apply to this claim and the defendants' motion to dismiss the claim on that ground must be denied.

### c. Commerce Clause

The final challenge by the defendants based on res judicata is against the plaintiffs' Commerce Clause claim under Article I, Section 8 of the Constitution. The sixth count of the complaint asserts that the "Commissioner's ZEV regulations unreasonably burden interstate commerce by commanding the allocation of ZEVs to New York, by restricting the number of non-ZEVs actually sold, and by otherwise unreasonably distorting the free flow of commerce in lawful products,

---

**13.** Plaintiffs contend that evidence exists that shows how ineffective ZEVs are at reducing pollution and that this fact illustrates that the ZEV sales mandate is an unreasonable litigation which is not rationally related to a legitimate state interest. Pls.' Me. in Opposition to Defs.' Mot. to Dismiss or for Summ. J. at 31 (citing *In re Chateaugay Corp.*, 53 F.3d 478 (2d Cir.1995)). The Court notes that even though the initial

impact of ZEVs may be less than dramatic, a strong argument can be made for the rational basis for the State's desire to encourage manufacturers to develop ZEV technology for long term, tangible benefits.

**14.** See *Northeast Advanced Thermal Management Technology Project*, December 1996.

including federally certified '49–State' vehicles."[15] Compl. ¶ 70 at 20.

■ The defendants assert that the facts needed to maintain the Commerce Clause challenge against the ZEV sales mandate were available to the plaintiffs in the prior litigation which directly challenged that sales requirement. The Court agrees. In *MVMA III*, the Second Circuit analyzed the ZEV sales quota in deciding whether it violated § 177 of the Act. The Second Circuit noted:

> Under the current ZEV plan, manufacturers may sell any number of California-certified vehicles other than ZEVs so long as they also sell the specified percentage of ZEVs. Hence, New York has not acted as to limit (either directly or indirectly) the number of non-ZEV California certified vehicles they sell. The more non-ZEV California-certified vehicles they sell, the more ZEVs they must sell. How the manufacturers will insure the sale of ZEVs is not a matter we must resolve; suffice it to say that the sale of ZEVs will hinge on marketing and competitive factors, fields in which the manufacturers are experts.

*MVMA III*, 17 F.3d at 535. The ZEV plan which the Second Circuit analyzed is the same today as the plan which was adopted in April of 1992, over five years ago. It is apparent that the issue of the propriety of the ZEV sales mandate was addressed by the court, albeit in a different context than the Commerce Clause.[16] Plaintiffs had the option of bringing a Commerce Clause challenge in the prior action but chose not to do so. The simple fact that California has changed its ZEV sales requirement is of no relevance. The issue of the validity of the ZEV sales requirement was thoroughly addressed in the prior litigation and as a result, a second attempt to adjudicate that issue is barred by the doctrine of res judicata.

### 4. Standing and the Due Process Claim

As discussed earlier, in the fifth count of the complaint, the plaintiffs allege that the ZEV regulations violate their right to Due Process under the Fourteenth Amendment. Specifically, plaintiffs contend that "forcing automotive manufacturers to incur substantial penalties for failing to meet a percentage ZEV requirement is an arbitrary and capricious deprivation of their liberty interests and their property." Compl. ¶ 65 at 19. Inherent in this Due Process claim are separate theories under the Takings Clause and for Substantive Due Process. Defendants have moved to dismiss the claim. Citing the Supreme Court case of *Duquesne Light Co. v. Barasch,* plaintiffs advance their Due Process argument by complaining that they will not be able to generate a reasonable rate of return on their investment in ZEVs if they are forced to abide by the ZEV sales mandate. 488 U.S. 299, 308, 109 S.Ct. 609, 616, 102 L.Ed.2d 646 (1989) (if the rate charged by a power company "does not afford sufficient compensation, the State has taken the use of utility without paying just compensation.")

■ This Court is required to address standing even if the issue has not been raised by the parties. *See FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 607–08, 107 L.Ed.2d 603 (1990). "Article III of the Constitution limits the authority of the federal courts to decide only actual cases and controversies." *Lee v. Board of Governors of the Federal Reserve System,* 118 F.3d 905, 910 (2d Cir.1997) (citing *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). "The Supreme Court has recognized that a litigant's stake in the controversy must extend beyond mere interest in a dispute, and the doctrine of standing has developed to ensure the presence of 'that concrete adverseness which sharpens the presentation of issues upon which the court so largely de-

---

15. In their memoranda, plaintiffs assert that the Commerce Clause challenge is based in part on the change to the California ZEV sales mandate and the result that New York is now the only State attempting to enforce a sales mandate. Pls.' Me. in Opposition to Defs.' Mot. to Dismiss or for Summ. J. at 32. The Court notes that no such ground is raised in the complaint.

16. The Court is confident, however, that in light of the finding of the Second Circuit, a Commerce Clause challenge at that time or today would be unsuccessful.

pends.'" *Id.* (quoting *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)). "As with questions of jurisdiction generally, the party invoking the authority of the court bears the burden of proof on the issue of standing." *Id.* (citing *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204–05, 45 L.Ed.2d 343 (1975)). In order to establish standing, a movant must show:

> (1) that the plaintiff[s] have suffered an 'injury in fact'—an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there be a causal connection between the injury and the conduct complained of— the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at 910 (quoting *Bennett v. Spear,* —— U.S. ——, ——, 117 S.Ct. 1154, 1163, 137 L.Ed.2d 281 (1997) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992)).

 The plaintiffs have not demonstrated that they have suffered an "injury-in-fact" in this case. The manufacturers argue that there is a lack of demand for ZEVs and that they are too expensive for consumers. The Court finds this to be speculative. The manufacturers argue that there are no buyers for ZEVs when in fact the manufacturers have not offered ZEVs for sale in New York State. The plaintiffs assert that the ZEVs are too expensive and offer too short a range to satisfy consumers, yet consumers have not been given the option to purchase ZEVs. Whether or not the plaintiffs can generate a reasonable rate of return on their investment is completely unknown.

The ZEV sales mandate provides that manufacturers may choose to forego sales of ZEVs for any model year without penalty as long as the deficit is fulfilled in the next model year. 6 N.Y.C.R.R. Part 218–4.2(b).[17] Thus, because the manufacturers have not yet been subjected to statutory penalties, there has been no deprivation of Due Process at this time. Furthermore, with the advancement of battery technology proceeding rapidly, it is quite possible that battery technology which is less affected by cold temperatures than the lead-acid batteries largely available today will be ready for sale within the 1999 model year. Therefore, it is feasible that advanced battery ZEVs could be available and enough sold prior to the end of the 1999 model year which would avoid any penalties whatsoever.

In short, a Due Process claim at this time is premature since the plaintiffs have not yet sustained an injury. If the manufacturers do, in fact, endure a financial penalty after trying to sell ZEVs, or cannot obtain a reasonable rate of return on their investment after attempting to sell ZEVs in New York State, a Due Process claim may then be viable. As a result, the defendants' motion to dismiss the Due Process claim must be granted.

### B. *Summary Judgment*

Since the Court relied upon matters outside the pleadings in reaching the conclusions set forth, the motions on the remaining claims will be treated as motions for summary judgment. Fed.R.Civ.P. 12(c) and 56. Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 580 (2d Cir.1991). The moving party carries the initial burden of demonstrating an absence of a genuine issue of material fact.

---

**17.** The regulation provides:
> Manufacturers which sell fewer ZEVs than required, in New York State, in a given model-year shall make up the deficit by the end of the next model-year, by selling an additional number of ZEVs in New York State, equal to their deficit or by submitting a commensurate among of f/mi NMOG credits earned exclusively from the sale of ZEVs.
> 6 N.Y.C.R.R. § 218–4.2(b).

Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Project Release v. Prevost,* 722 F.2d 960, 968 (2d Cir.1983). A genuine issue is an issue that, if resolved in favor of the non-moving party, would permit a jury to return a verdict for that party. *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 57 (2d Cir.1997) (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510).

When the moving party has met the burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,* 475 U.S. at 586, 106 S.Ct. at 1356. At that point, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56: *Liberty Lobby Inc.,* 477 U.S. at 250, 106 S.Ct. at 2511; *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. at 1356. To withstand a summary judgment motion, evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. *Liberty Lobby, Inc.,* 477 U.S. at 248–49, 106 S.Ct. at 2510–11; *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. at 1356. Thus, summary judgment is proper where there is "little or no evidence ... in support of the non-moving party's case." *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223–24 (2d Cir.1994) (citations omitted).

### 1. Preemption of ZEV Mandate by §§ 209(a) and 177

Counts one and two of the complaint challenge New York's ZEV requirement by arguing that the mandate conflicts with §§ 209 and 177 of the Act. "The familiar rules of statutory construction look first to the 'language of the statute itself because,

when looking at its language, a court should presume that the statute says what it means.'" *Id.* at 531 (quoting *Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1072 (2d Cir.1993)). "'In the usual case, where the language of the statute is clear, that is the end of the analysis.'" *Id.* (quoting *Lewis v. Grinker,* 965 F.2d 1206, 1215 (2d Cir. 1992)). "Even when the meaning of language seems apparent, it must be remembered that we are attempting to ascertain Congress' purpose; where ambiguity resides in a statute, legislative history and other tools of interpretation may be employed to determine legislative purpose more perfectly." *Id.* (citing *Aslanidis,* 7 F.3d at 1073).

Section 209(a) clearly illustrates that Congress saw fit to prevent individual States from imposing their own emission standards on new motor vehicles. *See also MVMA V,* 79 F.3d at 1302 ("In general, state regulation of automotive tailpipe emissions is preempted by the federal Clean Air Act.") (citing 42 U.S.C. § 7543(a), CAA § 209(a)). Section 209(a) provides:

> No State or any political subdivision thereof shall adopt or attempt to *enforce any standard relating to the control of emissions from new motor vehicles* or new motor vehicle engines subject to this part. No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.

42 U.S.C. § 7543(a) (emphasis added).

The manufacturers set forth several arguments in support of preemption. Many of these arguments attack the validity of the ZEV mandate itself, an issue that has been decided in the prior litigation.[18] As a preliminary argument, the manufacturers contend that in the prior litigation, the State argued that the ZEV mandate is in fact a "standard

---

**18.** First, the plaintiffs contend that the Commissioner's regulations violate § 209 because they require the manufacturers to include a specified number of ZEVs in their sales fleet. Second, the manufacturers assert that the ZEV mandate violates the prohibition against certification of new motor vehicles by an individual State. These arguments were raised and fully litigated in the prior proceeding and will therefore not be considered by the Court in that context.

relating to the control of emissions" and therefore cannot take the opposite stance during this action under the doctrine of judicial estoppel. Second, the plaintiffs maintain that Congress' intention was to have broad preemption. Third, the plaintiffs assert that the EPA has not determined if the ZEV sales mandate is a "standard relating to the control of emissions." Fourth, the manufacturers argue that an enforcement mechanism can be a "standard relating to the control of emissions." Fifth, the manufacturers contend that § 209(a) preempts state mechanisms to enforce standards. Finally, the plaintiffs assert that the language in § 209(a) referring to the prohibition of State certification and inspection of new vehicles prohibits the ZEV mandate.[19] Defendants contend simply that the ZEV requirement is not a "standard relating to the control of emissions from new motor vehicles" and is therefore not preempted under § 209(a) or § 177.

### a. Judicial Estoppel

Before getting to the actual merits of the debate over whether the ZEV sales mandate is an "emission standard" or an "enforcement mechanism," the plaintiffs' argument that the defendants are judicially estopped from adopting their current stance must be addressed. Plaintiffs set forth two arguments. First, the manufacturers contend that the defendants in the earlier litigation agreed that changes made by California would have to be adopted by New York and that they may not disagree with that stance now. Second, the plaintiffs assert that the defendants in the earlier litigation argued that the ZEV sales mandate is in fact an emissions standard and since the defendants prevailed in the earlier litigation, they are bound to hold that position. Defendants contend that the first argument is without merit because they are not arguing a contrary proposition in the current litigation. Second, defendants assert that since no Court relied on their argument regarding whether or not the ZEV sales mandate was an emission standard, they are not bound to hold that position in the current litigation.

"Judicial estoppel is a doctrine that forbids a party from advancing contradictory factual positions in separate proceedings." *AXA Marine and Aviation Ins. v. Seajet Industries,* 84 F.3d 622, 628 (2d Cir. 1996). "[T]here are two distinct objectives behind judicial estoppel, both of which seek to protect the judicial system." *Bates v. Long Island R.R.,* 997 F.2d 1028, 1038 (2d Cir.), *cert. denied,* 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 452 (1993). "First, the doctrine seeks to preserve the sanctity of the oath by demanding absolute truth and consistency in all sworn positions." *Id.* "Preserving the sanctity of the oath prevents the perpetuation of untruths which damage public confidence in the integrity of the judicial system." *Id.* "Second, the doctrine seeks to protect judicial integrity by avoiding the risk of inconsistent results in two proceedings." *Id.* "A party invoking judicial estoppel must show that (1) the party against whom judicial estoppel is being asserted advanced an inconsistent factual position in a prior proceeding, and (2) the prior inconsistent position was adopted by the first court in some manner." *AXA Marine and Aviation,* 84 F.3d at 628 (citing *Bates,* 997 F.2d at 1038).

Plaintiffs' first argument that the defendants argued in the first litigation that New York State would have to abide by changes made by California and therefore may not take a contradictory stance in the present litigation does not pass the *Bates* test. The defendants do not dispute the fact that they did espouse the view that changes in "emissions standards" by California would have to be mirrored by New York State. In fact, the defendants still abide by that premise. The defendants argue that the ZEV sales mandate is not an emissions standard and therefore they are not bound by California's change in policy. Since the defendants have not "advanced an inconsistent factual position in a prior proceeding," the first part of the *Bates* test is not met and judicial estoppel therefore does not apply.

---

**19.** Once again, the Court notes that this argument attacks New York's ZEV mandate as it existed before California's actions.

■ Second, the plaintiffs assert that the defendants argued in the prior proceeding that the ZEV sales mandate is an emissions standard and have adopted the contrary view in this proceeding. Applying the *Bates* test to this argument, the first element is satisfied; the defendants did indeed advance an inconsistent factual position in the prior proceeding which is contrary to the position advanced in this action. However, the second element of the *Bates* test, showing that "the prior inconsistent position was adopted by the first court in some manner," is not satisfied. As will be discussed later, in *MVMA III* the Second Circuit clearly stated that it chose not to address the emission standard or enforcement mechanism argument:

> The parties dispute, as an initial matter, whether the ZEV quota is a 'standard[ ] relating to control of emissions' within the meaning of § 177. Since the resolution of the dispute would not be dispositive of the ZEV mandate's validity, it need not be addressed other than to say that regardless of whether or not the ZEV quota is a standard, it still cannot violate § 177.

*MVMA III*, 17 F.3d at 536. Therefore, it is evident that the Court did not adopt the prior inconsistent position in any manner whatsoever, and the second part of the *Bates* test is not met. For these reasons, the defendants are not barred by judicial estoppel in this action.

### b. Emission Standard vs. Enforcement Mechanism

As discussed earlier, § 177 provides:

Notwithstanding section 7543(a) [CAA § 209(a) ] of this title, any State which has plan provisions approved under this part may adopt and enforce for any model year standards relating to control of emissions from new motor vehicles or new motor vehicle engines and take such other actions as are referred to in section 7543(a) of this title respecting such vehicles if—

(1) such standards are identical to the California standards for which a waiver has been granted for such model year, and

(2) California and such State adopt such standards at least two years before commencement of such model year (as determined by regulations of the Administrator).

42 U.S.C. § 7507.

■ There is no question that there is an inherent distinction between an emission standard and an enforcement mechanism. While § 177 clearly sets forth that individual States may not create their own emission standards and must comply with either the Federal or California standards, the Second Circuit has held that the Act does not place this restriction on States in regards to enforcement of those emission standards. In addressing the potential enforcement of the New York Low Emissions Vehicle Program in the prior litigation, the Second Circuit clearly distinguished between emission standards and enforcement mechanisms:

> Although the 'piggyback' provision requires states to adopt standards identical to those in place in California to avoid preemption, there is no such identicality requirement for the mechanism employed to enforce those standards. Although the Clean Air Act requires an 'enhanced' inspection and maintenance program to reduce vehicle emissions, ... there is no requirement that the cutpoints and other features of the program match those in California. Moreover, from a practical standpoint, it is understandable that Congress did not limit states in this way—enforcement techniques will necessarily vary from state to state.

*MVMA V*, 79 F.3d at 1305, see *also Motor and Equip. Mfrs. Ass'n v. Environmental Protection Agency (MEMA)*, 627 F.2d 1095, 1112 (D.C.Cir.1979). Therefore, in order to determine whether New York's ZEV mandate is preempted by the Act, this Court is obligated to determine if the ZEV requirement is a "standard relating to the control of emissions" or if it is an "enforcement procedure." Of course, if the ZEV mandate is an "emissions standard," it is preempted by the Act because New York's standards would have to be identical to California's standards, and California has abandoned its ZEV mandate for the model years 1998 through 2002. On the other hand, if the ZEV mandate is an

"enforcement procedure," it is not preempted by the Act.

Unfortunately, the regulations do not provide definitions of the terms "emissions standard" or "enforcement procedure." [20] Furthermore, the specific question of whether or not the ZEV sales mandate is a "standard relating to the control of emissions from new motor vehicles" has not been addressed by the Second Circuit. In fact, as noted earlier, in *MVMA III* the Second Circuit chose not to address that very issue.[21]

All parties cite the decision of *MEMA* as supporting their interpretation of the term "standard." In *MEMA,* the Court was analyzing § 209 in the context of "in-use maintenance regulations" [22] and determined that the term "standard" refers to "quantitative levels of emissions" rather than methods of enforcing standards. 627 F.2d at 1112. "The Senate Report on the Air Quality Act of 1967, discussing the preemption provision, mentions 'standards' for hydrocarbons, nitrogen oxides, and carbon monoxide in obvious reference to the numerical limitations on those pollutants." *id.* (citing S.Rep No. 403, 90th Cong., 1st Sess. 32 (1967)).

Furthermore, the Court noted that the "Administrator [of the EPA] has consistently made a distinction between standards and accompanying enforcement procedures, confining the former to regulations on quantitative levels of emissions." *Id.* at 1113. The

Court further made reference to a Supreme Court decision which, in "construing the word 'standards' in another section of the Clean Air Act, [it defined the word] as 'a quantitative level' to be attained by the use of 'techniques,' 'controls,' and 'technology.'" *Id.* (quoting *Adamo Wrecking Co. v. United States,* 434 U.S. 275, 286, 98 S.Ct. 566, 573, 54 L.Ed.2d 538 (1978)).

The D.C. Circuit was also careful to note the intentional distinction on the part of Congress between "standards" and "enforcement procedures" in subsection (b) of § 209. *Id.* at 1113.

> The only species of emissions control regulations which directly addresses air quality is the standard.... An enforcement procedure, by contrast, does not directly relate to air quality.... Of course, the absence or ineffectiveness of an enforcement program might endanger the ability of the standards to accomplish the levels of emissions they seek, and thus an indirect relationship exists between enforcement procedures and the public health and welfare. Yet, the relationship turns on the impact of the enforcement procedures on the effectiveness of the standards.

*Id.*

Turning to the issue of the ZEV sales mandate, the Court holds that the mandate is an "enforcement procedure" and is

---

20. In the prior litigation, it was asserted that § 302(k) provided an adequate definition for emission standard. The Second Circuit found that

> The precise term "emission standard" is not found in the language of either section relevant to the instant action. More importantly, § 302(k)'s definition was enacted ten years after § 209(b) and was intended to apply only in the context of regulating emissions from stationary sources, not moveable sources like automobiles.

*MVMA III,* 17 F.3d at 533 (citing *MEMA,* 627 F.2d at 1112 n. 35).

21. The parties dispute ... whether the ZEV quota is a 'standard[ ] relating to control of emissions' within the meaning of § 177. Since the resolution of the dispute would not be dispositive of the ZEV mandate's validity, it need not be addressed other than to say that regardless of whether or not the ZEV quota is a standard, it still cannot violate § 177.

*MVMA III,* 17 F.3d at 536.

22. Under the Act, motor vehicle manufacturers are required to warranty the emission control devices attached to the vehicles they sell. Under the warranty program, manufacturers must guarantee that the vehicles they sell meet the requirements under the Act. The program also requires the manufacturers to replace nonconforming emissions equipment on vehicles maintained by the owner in accordance with written maintenance instructions provided by the manufacturer. The term "certification process" refers to the procedures which enable a manufacturer to demonstrate that a class of motor vehicle complies with the standards set forth by the Act. The term "in-use maintenance regulations" refers to the care which must be taken by the purchaser in order to maintain the manufacturer warranty on the emissions equipment. The maintenance required by the purchaser may not be greater than that which can be performed by the manufacturer in the certification process. *See MEMA,* 627 F.2d at 1102–03.

not an "emission standard" under §§ 209 and 177. The ZEV sales mandate does not specifically set forth numerical limitations on pollutants and its primary function is to force the development of ZEV technology. At its heart, the sales mandate forces manufacturers to sell a specified percentage of ZEVs in relation to the sale of its conventional vehicles. If the manufacturers do not wish to supply ZEVs, they can choose to limit the sale of conventional vehicles in New York State, purchase ZEV credits from other manufacturers, or settle their deficit financially with the State. However unappealing these options may be to the manufacturers, it does not alter the fact that the ZEV sales mandate does not specifically limit the emissions of new motor vehicles. The Second Circuit has clearly stated that the ZEV sales mandate itself does not violate the Act. *MVMA III,* 17 F.3d at 536–37. It further noted that the "ZEV sales mandate was obviously included by California [and New York] in the LEV plan to encourage the development, production, sale and use of ZEVs." *Id.* at 536. "The Act is concededly a technology forcing' law." *Id.*

The plaintiffs are correct in their assertion that the EPA has not decided the issue of whether or not the ZEV sales mandate is in fact a standard or enforcement mechanism. Pl.'s Me. in Opp'n to Defs.' Mot. to Dismiss at 8 (citing "Supplemental Notice of Proposed Rulemaking on Ozone Transport Commission," 59 Fed.Reg. 48664, 48691–92 (Sept. 22, 1994)). While the EPA hesitated to adopt a view that defined emission standards as only being levels of specific pollutants, it also did not offer to expand the definition and concluded that "it need not reach a decision on this issue at this time." 59 Fed. Reg. at 48692. The EPA further stated that "section 177 should *not* be read to require that once a state has promulgated one California standard for a particular model, the state should adopt all of California's standards relating to the control of emissions from all types of motor vehicles for that model year." *Id.* (emphasis added). Rather, "the state need not adopt other standards that are not integral to the particular program being adopted" and states may adopt an LEV program and omit a ZEV sales

mandate if they so choose. *Id.* In other words, the EPA encourages flexibility and states may select portions of programs which they feel accomplish their goals, yet leave out less appealing pieces. This is also consistent with the Second Circuit's holding that New York was not bound to adopt California's Clean Fuel program when it chose to adopt the LEV program. *MVMA V,* 79 F.3d at 1307.

While it is clear that the EPA firmly stands for the proposition that states must adopt emission standards that are identical to California, it is equally clear that states do not have to adopt California standards in their entirety and that the EPA has not decided if the ZEV sales mandate is in fact a standard. Furthermore, while it may be true that the definition of emission standard should be broader and include more than just specific pollutants, this is clearly unchartered territory and the Court is of the opinion that including the ZEV sales mandate would broaden the definition of "emissions standard" too far. The most important goal of the ZEV sales mandate is to encourage the manufacturers to develop zero emissions technology in the form of electric vehicles or other variations of propulsion technology. The ZEV sales mandate will undoubtedly effect the sum of emissions from motor vehicles over time. However, these effects are indirect in nature and long-term in effect and will admittedly have less of an impact in the early stages of the mandate. For this reason, the mandate itself is not an emissions standard, but rather a long term strategy.

In conclusion, the Court holds that the ZEV sales mandate does not rise to the level of a "standard relating to the control of emissions" under the Act. 42 U.S.C. § 7507, CAA § 177. As a result, the ZEV sales mandate does not run afoul of § 209. Furthermore, because it is not a standard, the ZEV sales mandate is not required to be identical to the California standards and therefore does not conflict with the first subsection of § 177. Therefore, defendants are entitled to summary judgment on counts one and two.

### 2. Implied Preemption of the ZEV Mandate

The manufacturers assert that the Act impliedly preempts the Commissioner's regulations because the ZEV sales mandate conflicts with the Congressional objectives behind the Act. Plaintiffs argue that New York's regulations stand alone among the fifty states and one of Congress' main goals in passing the Act was to avoid requiring manufacturers to build different vehicles to accommodate varying state regulations. Defendants contend that the ZEV sales mandate is not impliedly preempted because it is not an emission standard and is therefore not covered by § 177 or § 209 of the Act. Defendants further argue that since the ZEVs to be sold in New York are already California-certified vehicles, manufacturers will not have to create a separate ZEV for the State.

■■■■ "Even where Congress has not expressed an intent to pre-empt the entire field of regulation, a particular state rule will be pre-empted when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Toy Manufacturers of America v. Blumenthal,* 986 F.2d 615, 623 (2d Cir.1993) (citing *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963) and *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)). "It is true that where a preemption provision provides a 'reliable indicium of congressional intent' a court is required to restrict its preemption analysis to the terms of that clause." *Id.* "However, a finding of implied preemption (which enlarges the field of preemption beyond what is covered by an express provision) is not automatically foreclosed by the existence of a preemption clause...." *Id.* "*Cipollone* specifically requires courts to determine first that the express preemption provision provides 'a reliable indicium of congressional intent with respect to state authority' before it may reject implied preemption arguments." *Id.* at 623–24 (citing *Cipollone v. Liggett Group,*

*Inc.,* 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992)).

■■■ The plaintiffs argue, and the Court agrees, that the express preemption clause in the Act does not foreclose the possibility of implied preemption. While it is true that § 209(a) prohibited states other than California from adopting their own emission standards, Congress also saw fit to allow other states to model their standards after California in adopting § 177.

■■■ Ultimately, however, the plaintiffs' implied preemption argument fails. First, as discussed earlier, New York's ZEV sales mandate is not an emission standard. Rather, the mandate requires manufacturers to sell a specified percentage of ZEVs in relation to the number of traditional vehicles sold. Manufacturers have the options to produce the required number of ZEVs, limit the sales of traditional vehicles, purchase ZEV credits from other manufacturers, or purchase ZEV credits from the State. Thus, the ZEV sales mandate does not create a different emissions standard that would overburden the manufacturers.

Second, Congress' primary concern was to avoid forcing manufacturers to build as many as 51 different vehicles to accommodate differing emission standards from state to state. *See* H.R.Rep. No. 253, 95th Cong., 1st *Sess.,* at 2776 and *MVMA I,* 810 F.Supp. at 1338. Congress noted:

> "To the extent that a manufacturer could demonstrate that each vehicle leaving the assembly line performs at levels to which it was certified, that manufacturer could claim 'undue burden' if a state that adopted the California standard applied enforcement procedures that would require materials changes in the manufacture of such vehicles, i.e., production of a third car."

Committee on Env't and Pub. Works, 103d Cong., 1st Sess., A Legislative History of the Clean Air Act Amendments of 1990 (Comm. Print 103–38, Vol. 1) at 1022. In other words, Congress was more concerned with States enforcing the California numeric emission standards differently thus requiring the manufacturers to meet the numeric stan-

dards for individual states by building "third vehicles." Since ZEVs are uniformly "zero emissions," this Congressional concern is not an issue.

Congress does not address the manufacturers' concern of building electric vehicles that may need to be modified for variations in climate. However, Congress seems to be aware of the fact that variations in the manufacturing of conventional vehicles does not raise "third vehicle" concerns:

> "So-called 'running changes' are made in the emissions equipment placed on vehicles in production 'without any changes being made in the vehicles' existing emissions certificate.... Thus, physical differences in emissions equipment under a single certificate are even now being made by the auto manufacturers without anyone having contended that this creates a 'third vehicle.'"

*Id.*

Furthermore, while overburdening the manufacturers is one concern of Congress, on the other side of the scale is Congress' desire to enable individual states to address poor air quality. In adopting § 177, Congress noted that § 209(a) "now interferes with legitimate police powers of States, prevents effective protection of public health, limits economic growth and employment opportunities in nonattainment areas for automotive pollutants, and unduly stifles enforcement of present federal emission standards." H.R.Rep. No. 253, 95th Cong., 1st Sess., at 2776. Thus, balancing the scale between overburdening manufacturers and enabling individual states to address air quality is at the very heart of the Act.

Because the ZEVs to be sold in New York are California-certified cars, the manufacturers are under no obligation to create a "third-vehicle." Rather, their only obligation is to have the California-certified ZEVs available for sale in New York. The plaintiffs argue that the present ZEV technology is not viable in the colder climate of New York

State. Regardless of the validity of that argument, the fact remains that New York State is not requiring different ZEVs than those sold in California.[23] Thus, there is no conflict with the Act, express or implied. In conclusion, it cannot be said that the ZEV sales mandate "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines,* 312 U.S. at 67, 61 S.Ct. at 404.

### III. *CONCLUSION*

While the technology-forcing regulations presented here will no doubt be the subject of future debate and litigation, there can be no question that they are at least a method of achieving the salutary goals of the Clean Air Act. There is also no question that there may be hardships occasioned by their implementation. However, these hardships are unquestionably acknowledged and overborne by Congress' intent that the quality of the air we breath should continue to improve and benefit from all available technological advances.

Accordingly, it is hereby

1. ORDERED that for the First claim which alleges that the New York ZEV sales mandate is preempted by § 209(a) of the Clean Air Act, plaintiffs' motion for summary judgment is DENIED, and defendants' motion for summary judgment is GRANTED; and it is further,

2. ORDERED that for the Second claim which alleges that the mandate is in violation of § 177's identicality requirement, plaintiffs' motion for summary judgment is DENIED and defendants' motion for summary judgment is GRANTED; and it is further,

3. ORDERED that for the Third claim which involves the alleged preemption of New York's ZEV sales mandate pursuant to § 249 of the Clean Air Act, plaintiffs' motion for summary judgment is DENIED, and defendants' motion to dismiss

---

**23.** The Court also notes that even assuming that the range of electric vehicles is limited by cold temperatures and snow, the areas of the State with the worst air pollution, specifically New York City and Long Island, are much more temperate and receive little snow in comparison to other parts of the State. Therefore, the areas in which ZEVs could provide the most benefit are also the areas that are most hospitable to current ZEV technology.

is GRANTED pursuant to the doctrine of res judicata; and it is further,

4. ORDERED that for the Fourth claim alleging that the ZEV sales mandate is impliedly preempted by the Clean Air Act, plaintiffs' motion for summary judgment is DENIED, and defendants' motion for summary judgment is GRANTED; and it is further,

5. ORDERED that for the Fifth claim alleging that the ZEV sales mandate violates the plaintiffs' Due Process rights under the Fourteenth Amendment, the defendants' motion to dismiss is GRANTED; and it is further,

6. ORDERED that for the Sixth claim which alleges violations of the Commerce Clause of Article I, Section 8 of the Constitution, defendants' motion to dismiss is GRANTED pursuant to the doctrine of res judicata; and it is further,

IT IS SO ORDERED.